UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

―――――――――――――――――――――――――

| | |
|---|---|
| EMHART INDUSTRIES, INC., ) | |
| ) | |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | |
| v. ) | C.A. No. 06-218 S |
| ) | |
| NEW ENGLAND CONTAINER ) | |
| COMPANY, INC., ET AL., ) | |
| ) | |
| Defendants/Counterclaim Plaintiffs. ) | |
| ) | |
| ―――――――――――――――――――――) | |
| ) | |
| EMHART INDUSTRIES, INC., ) | |
| ) | |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | |
| v. ) | C.A. No. 11-023 S |
| ) | |
| UNITED STATES DEPARTMENT OF ) | Consolidated |
| THE AIR FORCE, ET. AL., ) | |
| ) | |
| Defendants/Counterclaim, Crossclaim, ) | |
| and Third-Party Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| BLACK & DECKER, INC., ET AL., ) | |
| ) | |
| Third-Party Defendants. ) | |
| ―――――――――――――――――――――) | |

**UNITED STATES' PHASE II PRETRIAL MEMORANDUM**

Phase II of this Trial will require the Court to determine whether the Environmental Protection Agency's ("EPA") selection of the remedy for the Centredale Manor Restoration Project Superfund Site (the "Site") on September 28, 2012, was arbitrary and capricious based on the administrative record before EPA, and whether Emhart Industries, Inc. and Black & Decker, Inc. (collectively, "Emhart") had sufficient cause when they refused to comply with EPA's June

1

10, 2014, administrative order requiring Emhart to begin cleaning up the Site.[1]  If the Court finds in favor of the United States on these two issues– the remedy selection and Cleanup Order – then the Court should order Emhart to comply with the Cleanup Order.  The Court will also need to determine the amount of penalties and damages, respectively, for Emhart's failure to comply with the Cleanup Order if Emhart is unable to prove its "sufficient cause" defense.  The United States seeks an order requiring Emhart to begin the cleanup of the Site.  In addition, the United States seeks entry of judgment of liability for payment of stipulated Past Costs, which judgment will be binding in any action seeking recovery of Future Costs.

While the amount of past costs that the United States has incurred was to be a topic for this phase of trial, the parties have stipulated that the amount of the United States' Past Costs is $32,000,000.  Docket No. 444.  Therefore, the United States will not present evidence regarding its Past Costs.  The only exception to this is that the United States will present limited evidence regarding costs it incurred to perform work (including work to enforce the Cleanup Order) after Emhart refused to comply with the Cleanup Order.  These costs form the basis for punitive damages that the Court may order under CERCLA.

The evidence, including the EPA administrative records for the two administrative actions, will show that EPA's selection of the remedy in the ROD was in accordance with the law.  The evidence will further show that EPA's Cleanup Order was lawful.  For these reasons, the Court should grant the relief the United States requests.  Emhart will be unable to present evidence to demonstrate that EPA acted in an arbitrary and capricious manner in taking these administrative actions.  While Emhart may have preferred that EPA select a less costly remedy, Emhart cannot show that EPA acted in an arbitrary and capricious manner when selecting the

---

[1] The order, titled Administrative Order for Remedial Design, Remedial Action, and Operation and Maintenance will be referred to here as the Cleanup Order.

remedy.  Likewise, while Emhart may argue that it was singled out as the sole recipient of the Cleanup Order to begin the cleanup of the Site, EPA can exercise its enforcement discretion to issue cleanup orders to a limited number of parties, and doing so does not make the finding that there is an imminent and substantial endangerment an arbitrary and capricious act by EPA.

### ISSUES FOR PHASE TWO OF TRIAL

This phase of trial presents the following issues:

1.  Remedy Selection:

    a.  Whether EPA acted in an arbitrary and capricious manner when selecting the remedy for the Site in its September 28, 2012, Record of Decision ("ROD"). Emhart alleges that EPA acted in an arbitrary and capricious manner in selecting the remedy in the ROD.

    b.  If the Court concludes that EPA acted in an arbitrary and capricious manner in selecting the remedy in the ROD, it must remand the decision to EPA to reconsider the alternatives and revise and reissue a new ROD in accordance with the law.

    c.  If the Court concludes that EPA did not act in an arbitrary and capricious manner in selecting the remedy in the ROD, the Court should enter a finding for EPA upholding the remedy selected in the ROD.

2.  Cleanup Order

    a.  Whether EPA acted in an arbitrary and capricious manner in finding that there may be an imminent and substantial endangerment at the Site when issuing the UAO to Emhart Industries and Black & Decker requiring them to begin the cleanup of the Site.  If not, did Emhart at all times have a sufficient cause to not

comply with the Cleanup Order.

b.  If the Court finds that EPA did not act in an arbitrary and capricious manner in finding that there may be an imminent and substantial endangerment when issuing the Cleanup Order, the Court should order Emhart to comply.  And if the Court finds that at any time following the issuance of the Cleanup Order Emhart lacked sufficient cause to refuse to comply, the Court should assess both civil penalties and punitive damages against Emhart for non-compliance with the Cleanup Order.

## ORDER OF TRIAL

Pursuant to the parties' agreed-upon structure for this phase of trial, the United States expects that trial will proceed as follows:

1.  The United States will present its witnesses[2] to explain the administrative records for the purpose of establishing the following facts:

a.   EPA selected a remedy for the Site in the ROD.

b.  The remedy selection was based on the administrative record that was certified by EPA.

c.  The ROD administrative record reflects that EPA followed proper procedures in selecting the remedy.

d.  EPA issued the Cleanup Order to Emhart.

e.  The Cleanup Order contained EPA's finding that there may be an imminent and

---

[2] The United States objects to having witnesses for the purpose of establishing that EPA's response actions were not arbitrary, not capricious and were selected in accordance with law.  Under Section 113(j) of CERCLA, judicial review of EPA's selection of any response action should be limited to the administrative record for such action, subject to certain exceptions.  42 U.S.C. § 9613(j).  The United States disagrees that any exceptions are applicable in this case, but understands that this Court has ruled otherwise, and that the Parties will be permitted to have witnesses testify regarding topics related to the administrative records for the two response actions.

substantial endangerment.

    f.   For the Cleanup Order, EPA based its finding that there may be an imminent and substantial endangerment on the administrative record that was certified by EPA.

    g.   The Cleanup Order administrative record reflects that EPA followed proper procedures in issuing the order.

    h.   Emhart failed to comply with the Cleanup Order. and

    i.   Penalties and punitive damages should be awarded for Emhart's failure to comply with the Cleanup Order.

2.   The burden then shifts to Emhart to show that EPA's selection of the remedy in the ROD or EPA's finding that there may be an imminent and substantial endangerment when issuing the Cleanup Order were arbitrary and capricious or otherwise not in accordance with law; to prove an affirmative defense that it had sufficient cause to refuse to not comply with the Cleanup Order; and to respond to the United States' request for civil penalties and punitive damages.

3.   Next, the United States may, as necessary, present evidence and witnesses to rebut Emhart's evidence and witnesses regarding remedy selection; to respond to Emhart's sufficient cause affirmative defense regarding the UAO; and to respond to any argument that the Court should not assess penalties and damages.

4.   Finally, Emhart may, as necessary, present evidence and witnesses as rebuttal with respect to its affirmative defense on sufficient cause.

## CASE SUMMARY

Following twenty days of trial and its issuance of its September 17, 2015 Findings of Fact and Conclusions of Law, the Court is well aware of the history of the former industrial

operations at the Site, and has already received evidence regarding the nature and distribution of hazardous substances found at the Site.  Therefore, the focus of the United States' case will not be on where hazardous substances originated and where they are now found, but instead will be on the administrative actions that EPA has taken to select the cleanup for this Site, and to order Emhart to begin that cleanup.

The Court's review of the EPA actions is not de novo, but instead is based on the two administrative records prepared for these administrative actions.  The United States will show that EPA followed the detailed process required by CERCLA to take these administrative actions, and that therefore the Court should give deference to EPA's technical judgment in selecting the remedy in the ROD and in finding that there may be an imminent and substantial endangerment when issuing the Cleanup Order and uphold these administrative actions.

I.        **Background Law**

A.        **EPA Response Actions and Administrative Records**

CERCLA Section 104(a) authorizes the United States (1) to "remove or arrange for the removal of" hazardous substances; and (2) to "provide for remedial action relating to" hazardous substances.  42 U.S.C. § 9604(a).  Response actions, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), include both "removal" and "remedial" actions.

EPA's selection of the remedy for the Site in the ROD was a response action within the definition of CERCLA as it involved an EPA decision relating to the remediation of the hazardous substances at the Site.

EPA may issue a cleanup order upon a finding "that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility."  42 U.S.C. § 9606(a).  The

6

administrative authority to issue a cleanup order is granted by Congress to EPA in CERCLA to effectuate the swift cleanup of hazardous waste sites and a cleanup order is not tied to a finding of liability by a court. The determination that there is an imminent and substantial endangerment, thus allowing issuance of a cleanup order, is subject to arbitrary and capricious review by the Court. A recipient who fails to comply with the cleanup order has the burden to prove that they had sufficient cause for non-compliance. They may also choose to comply with the UAO and seek reimbursement under CERCLA 106(b).

Pursuant to Section 105 of CERCLA, EPA has published a set of regulations, known as the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), which sets forth EPA's procedures for implementing CERCLA. 42 U.S.C. § 9605; 40 C.F.R. Part 300. Both CERCLA and the NCP include provisions concerning, among other things, investigation of the site, selection of the remedial action, state participation, and public participation in the CERCLA process. See, e.g., 42 U.S.C. §§ 9621 & 9617; 40 C.F.R. §§ 300.430 & 300.515. Under Section 113(k) of CERCLA, and the NCP, EPA compiles an administrative record for each response action at a site. 42 U.S.C. § 9613(k); 40 C.F.R. § 300.800. The NCP contains guidelines for the "typical" content of the required administrative record for a response action, which includes:

> (1) Documents containing factual information, data and analysis of the factual information, and data that may form a basis for the selection of a response action.... (2) Guidance documents, technical literature, and site-specific policy memoranda that may form a basis for the selection of the response action.... (3) Documents received, published, or made available to the public under §300.815 for remedial actions, or § 300.820 for removal actions.... (4) Decision documents.... (5) Enforcement orders.... and (6) An index of the documents included in the administrative record file. 40 C.F.R. § 300.810(a).

As the NCP notes, the public, including a potentially responsible party such as Emhart, play a role in providing information in their comments to EPA for EPA to use in selecting response actions at sites.  EPA considers and responds to the comments received.

**B.     Court Review of EPA Response Actions**

Under CERCLA, the scope of "judicial review of any issues concerning the adequacy of any response action taken or ordered by [EPA]" is limited to the administrative record.  See 42 U.S.C. § 9613(j)(1).  And, as the Court has found, it is "bound to accept EPA's 'response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with the law.'"  Order on Scope of Review, Docket No. 421, at 4, quoting 42 U.S.C. § 9613(j)(2).    The burden of proof is on the party challenging EPA's decision.  42 U.S.C. § 9613(j)(2).

EPA's selection of a response action is arbitrary and capricious if:

> …the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it would not be ascribed to a difference in view or the product of agency expertise.

United States v. Washington Dep't of Transp., 450 F. Supp. 2d 1207, 1212 (W.D. Wash. 2006) (citing Inland Empire Pub. Lands Council v. Glickman, 88 F.3d 697, 701 (9th Cir. 1996) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))).  The Court has permitted Emhart to present some extra-record information at trial, without determining whether such information is admissible into evidence, finding that "at least some extra-record evidence will be useful to the Court as 'background information' and 'for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or ground of decision.'"  Order on Scope of Review, Docket No.

8

421, at 5, quoting <u>Asarco, Inc. v. U.S. Envtl. Prot. Agency</u>, 616 F.2d 1153, 1160 (9th Cir. 1980). However, as noted previously, the United States maintains that extra-record evidence should not be considered in determining whether the two administrative actions at issue were arbitrary and capricious, as EPA followed all required steps in arriving at these decisions and considered all relevant information, including information provided by Emhart, in reaching these decisions, and included all such information which it considered or relied upon in the administrative records for these decisions.  Emhart should not be permitted to provide any information that is not in the administrative records.  Emhart should instead be limited to presenting testimony and evidence to explicate the existing administrative records.

### 1.  Review of the ROD

Section 113(j)(2) of CERCLA states that "the court shall uphold [EPA's] decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. § 9613(j)(2).  Every Circuit that has addressed Section 113(j) has concluded that review of an EPA response action under CERCLA must be on the administrative record under an arbitrary and capricious standard, in light of the plain language of the statute and its clear legislative intent.[3]  The alternative, de novo review, is inconsistent with the complex, technical requirements for the clean-up of hazardous substance sites contained in CERCLA and the NCP. As explained by the Sixth Circuit:

> Ours should not be the task of engaging in a de novo review of the scientific evidence pro and con on each proposed remedy in the hazardous substance arena. The federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the

---

[3] <u>See, e.g.</u>,  <u>United States v. W.R. Grace & Co.</u>, 429 F.3d 1224, 1233 (9th Cir. 2005); <u>United States v. Burlington N. R. Co.</u>, 200 F.3d 679, 689 (10th Cir. 1999); <u>United States v. Princeton Gamma-Tech, Inc.</u>, 31 F.3d 138, 149-150 (3d Cir. 1994), rev'd on other grounds, 116 F.3d 1018 (3d Cir.1997); <u>In re Bell Petroleum Servs., Inc.</u>, 3 F.3d 889, 904-05 (5th Cir. 1993);  <u>United States v. Northeastern Pharm. & Chem. Co.</u>, 810 F.2d 726, 748 (8th Cir. 1986).

President's delegatee, the EPA administrator and his staff.
United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1424 (6th Cir. 1991).  EPA, the
agency designated to implement CERCLA's statutory requirements, has the expertise and
resources to interpret scientific data and apply the applicable technical standards to select an
appropriate response action.  See United States v. Burlington N. R. Co., 200 F.3d at 688-89 (the
Court will "give deference to the EPA's choice of response action and will not substitute our
own judgment for that of the EPA." (internal citation omitted)); United States v. Northeastern
Pharm. & Chem. Co., 810 F.2d at 748 ("Because determining the appropriate removal and
remedial action involves specialized knowledge and expertise, the choice of a particular cleanup
method is a matter within the discretion of the EPA.")[4]

### 2.   Review of the Cleanup Order

For the review of the Cleanup Order, only one part of this administrative action by EPA
is subject to review:  EPA's finding that there may be an imminent and substantial endangerment
at the Site.  As the Court has found, a potential issue of EPA's decision, as to whom it may issue
the Cleanup Order, is not under review in this second phase of trial as "the Court has already
conducted its de novo review on liability, and deemed Emhart the responsible party."  Order on
Scope of Review, Docket No. 421, at 2.

The question regarding the issuance of the Cleanup Order is whether the administrative
record supports EPA's finding that there may be an "imminent and substantial endangerment" as
set forth in the statute.  See 42 U.S.C. § 9606(a).  This finding is subject to an arbitrary and
capricious standard.  See United States v. Vertac Chem. Corp., 453 F.3d 1031, 1045 (8th Cir.

---

[4] See also B.F. Goodrich v. Betkoski, 99 F.3d 505, 528 (2d Cir. 1996); Minnesota v. Kalman W. Abrams Metals, Inc., 155 F.3d 1019, 1024 (8th Cir. 1998).

2006); United States v. E.I. duPont de Nemours & Co., 341 F. Supp. 2d 215, 249-50 (W.D.N.Y. 2004).

The court in E.I. duPont de Nemours & Co. examined an EPA finding "that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." 341 F. Supp. 2d at 246-53. It turned to a multitude of other cases for help in determining the phrase's meaning, as it is not defined in CERCLA. The courts in those cases found that:

> EPA "does not have to prove that an 'imminent and substantial endangerment' actually exists." United States v. Conservation Chem. Co., 619 F.Supp. 162, 192 (E.D. Mo.1985). Rather, the statute "clearly authorizes the United States to obtain relief when 'there *may* be an imminent and substantial endangerment.'" Id. (emphasis original) (quoting 42 U.S.C. § 9606(a)); see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 263 F. Supp. 2d 796, 836 (D.N.J. 2003) (under RCRA, "Plaintiffs need not show actual harm to health or the environment. It is enough to show that such an endangerment *may* exist.") (emphasis original); United States v. Valentine, 856 F. Supp. 621, 626 (D. Wyo. 1994) (holding that "[i]t is sufficient to demonstrate that there *may* be 'an imminent and substantial endangerment'") (emphasis original) (quoting 42 U.S.C. § 6973(a)).

E.I. duPont de Nemours & Co., 341 F. Supp. 2d at 246. The court in E.I. duPont de Nemours & Co. continued its examination of the phrase, breaking down the elements to examine each one:

> Endangerment: the court found that "endangerment" does not always mean actual harm, but can also mean a threatened or potential harm. EPA does not have to show that people may be endangered. Section 106 refers, rather, to an endangerment "to the *public health or welfare or the environment*" so EPA can fulfill the "endangerment" requirement by showing endangerment to one category or another alone.

> Environment: the court found that "environment" is broadly defined to include navigable waters, surface water, ground water, drinking water supply, land surface, subsurface strata, or ambient air within the jurisdiction of the United States.

> Imminent: the court found that after establishing "endangerment" the next

question is whether it is "imminent." Imminent does not mean immediate, but may be declared at any point in a chain of events which may ultimately result in harm.  It is possible for a harm to be imminent even though it may not be realized for years.

Substantial: the court then examined "substantial" and found it does not require "quantification of the endangerment," for example any specific information on how many deaths or injuries will occur or that a water supply will be contaminated to a specific degree.  An endangerment is considered substantial if there is reasonable cause for concern that someone or something may be exposed to a risk of harm if remedial action is not taken, keeping in mind that protection of the public health, welfare and the environment is of primary importance.

See 341 F. Supp. 2d at 246-48 (internal citations omitted).  The Cleanup Order

administrative record will show that each element is present in this case. In this case, EPA's

finding in the Cleanup Order that there may be an "imminent and substantial endangerment" is

based on the same conclusions about potential risks to human health and the environment that

led EPA to make a finding in the ROD that there may be an imminent and substantial

endangerment.  Those risks, derived from EPA's baseline human health and ecological risk

assessments, as supplemented, are summarized in detail in the Cleanup Order at Paragraphs 61-

65 (Exhibit US1490, CMRP-AR058267 - CMRP-AR058281) and demonstrate that residents

living along the River and visiting recreational anglers are subject to unacceptable cancer and

non-cancer risks from eating contaminated fish from Allendale and Lyman Mill Ponds and

accidentally ingesting or having direct skin contact with contaminated sediment, floodplain soil

and Source Area soils.  For example, a child resident exposed to Lyman Mill floodplain soil is

subject to a risk of at least 100 times greater than the higher end of EPA's acceptable risk range

for cancer risks and 20 times greater than the acceptable threshold level for non-cancer

hazards.  Ecological risks are present for wildlife that use the aquatic and wetland habitats of

Allendale Pond; the aquatic habitat in the Oxbow Area and wetland habitats in Lyman Mill

Pond.

### C.    Court Authority Regarding Response Actions

The Court has a number of tools granted to it by CERCLA to require parties to comply with the Act.  As described in the United States' pleadings in this case, the Court has the authority to order the following.

#### 1.    Site Cleanup

Pursuant to CERCLA Section 106(a), 42 U.S.C. § 9606(a), the Court can order Emhart and Black & Decker to comply with the Cleanup Order.

#### 2.    Past Costs

Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and consistent with its September 17, 2015, Findings of Fact and Conclusions of Law, the Court can enter a final judgment against Emhart for joint and several liability for the United States' Past Costs.[5]

#### 3.    Future Costs

Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the Court issues declaratory judgment against Emhart on liability that will be binding in any action to recover further response costs to be incurred in the future.[6]

#### 4.    Penalties

To ensure that parties comply with EPA orders, CERCLA authorizes the assessment of civil penalties for a violation of such an order.  Under CERCLA Section 106(b), 42 U.S.C. § 9606(b), if a person "without sufficient cause" fails or refuses to comply with a cleanup order

---

[5] The parties have stipulated that "Past Costs" consisting of costs through September 30, 2015, amount to $32,000,000. Stipulation, Sept. 13, 2016, Docket No. 444.  Costs incurred by the United States after September 30, 2015, are "Future Costs" even if they have already been incurred as of the start of this phase of trial.

[6] Future costs here refers to costs incurred by the United States after September 30, 2015.  Stipulation, Sept. 13, 2016, Docket No. 444.  The United States' costs incurred after September 30, 2015, are "further response costs" recoverable later as provided by 42 U.S.C. § 9613(g)(2)

issued by EPA, the Court may fine that person not more than $25,000 for each day that the violation continues.  This amount has subsequently been raised to $37,500 for the relevant time period of July 10, 2014 – November 2, 2015, and then raised to $53,907 for daily violations after November 2, 2015.  Federal Civil Penalties Inflation Adjustment Act of 1990, as amended through 2015, 28 U.S.C. § 2461.

### 5.  Punitive Damages

To further ensure compliance with EPA orders, CERCLA authorizes the assessment of punitive damages for a violation of such an order.  Under CERCLA Section 107(c)(3), 42 U.S.C. § 9607(c)(3), Emhart may be liable for punitive damages in an amount at least equal to, and up to three times, the amount of any costs incurred by the United States as a result of the failure to comply.

## II.    Summary of Facts Expected To Be Proven

The United States expects to prove facts sufficient to establish that EPA selected a remedy in a ROD issued on September 28, 2012, and that EPA issued a Cleanup Order on June 10, 2014, that EPA made a proper finding in the Cleanup Order that there may be an imminent and substantial endangerment at the Site, and that EPA prepared an administrative record for each of these administrative actions.[7]  Then the United States expects to prove facts sufficient to establish that neither Emhart nor Black & Decker complied with the Cleanup Order and therefore did not begin to implement the remedy contained in the ROD.  Finally the United States expects to prove facts sufficient to establish that it incurred costs as a result of Emhart's failure to comply with the Cleanup Order.

---

[7] The individual administrative records for EPA actions that preceded the ROD are presented solely as part of the ROD administrative record as Emhart is not challenging any of the pre-ROD administrative decisions.

Emhart will fail to carry its burden of proving that EPA acted in an arbitrary and capricious manner in selecting the remedy in the ROD and in making the Cleanup Order's finding that there may be an imminent and substantial endangerment. The United States also expects that Emhart will fail to carry its burden of proving that it had sufficient cause to not comply with the Cleanup Order, both when it was issued and after this Court issued its Findings of Facts and Conclusions of Law following the conclusion of Phase 1 of this trial.

A.     Selection of Remedy in the ROD

The United States will prove that EPA selected a remedy in a ROD issued on September 28, 2012, and Emhart has not challenged that a remedy was selected at that time. The United States will also prove that EPA prepared an administrative record that includes all of the documents that EPA considered or relied upon in selecting the remedy contained in the ROD. The administrative record for the ROD consists of Exhibits marked "US0600 – US1462" and this administrative record has been certified as complete by EPA.[8]

While the United States' maintains that the Court's review of the ROD should be limited to the information that was before EPA at the time it selected the remedy, and that this information is contained in the ROD administrative record, the Court has ruled that the parties can present testimony at trial to explain the administrative process EPA used to select the remedy contained in the ROD. Therefore, the United States will present a number of fact witnesses employed or retained by EPA, and an employee of the State of Rhode Island, to describe the administrative process used by EPA to select the remedy contained in the ROD and to highlight key documents within the ROD administrative record.

---

[8] *Letter from Laura Rowley, Dept. of Justice, to Ryan Jackson, Clerk for Judge Smith, Nov. 6, 2015,* enclosing EPA administrative record certifications.

**1.  Remedy Selection Process**

There is a standard procedure contained in CERCLA, the NCP, and EPA guidance documents that sets forth the process EPA uses to evaluate and select a cleanup remedy.  See 40 C.F.R. Part 300.430.  The following sets forth the key steps of the process, with citation to the relevant documents within the ROD administrative record.

> **Remedial Investigation**
> An assessment of the nature and extent of the contamination
> (US1098)



> **Risk Assessment**
> An assessment of the risks the contamination poses to human health and the environment
> **Final Ecological Risk Assessment - Sept. 2004**
> **Final Baseline Human Health Risk Assessment - Nov. 2005**
> **Final Supplemental Baseline Human Health and Ecological Risk Assesssment: Oxbow Area Floodplain Soil and Sediment - June 2011**
> **Technical Memorandum on Impact of Dioxin Reassessment - May 2012**
> (US1040; US1101; US1102; US1103; US1287; US1392)



> **Feasibility Study - April 2010**
> **Feasibility Study Addendum - Sept. 2011**
> Analysis of cleanup options
> (US1254; US1311)



16

**Proposed Plan - Oct. 2011**

**Proposed Plan Amendment - July 2012**

Explanation of proposed cleanup method from those analyzed in the Feasibility Study

(US1328; US1393)



**Public Comments on Proposed Plan**

Comments received at hearings, Dec. 2011 and July 2012, and in written comments, Nov. 2011 – March 2012 and July 2012 – Sept. 2012.

(US1343; US1346; US1348; US1349; US1383 (by Emhart); US1387; US1418 (by Emhart)



**Record of Decision - Sept. 2012**

Selection of the Remedy and Response to Public Comments

(US1444)

Witnesses for the United States will describe how EPA followed each of the steps above from 2000 to 2012, referring to the key documents in the ROD administrative record.  Among the significant documents that EPA prepared for this Site, and that it has included in the ROD administrative record, are the Remedial Investigation, Risk Assessments, Feasibility Study, Proposed Plan, Comments on the Proposed Plan from the public (including Emhart), and the ROD.

### 2.  The ROD

The most significant document is the ROD itself, a 656-page document consisting of 359 pages of text, with the remainder consisting of various attachments.  Exhibit US1444.  Among other things, the ROD contains summaries of EPA's investigations at the Site, the Site risks, the development and evaluation of remedial alternatives, and the reasons for EPA's remedy selection decision.  In the first six-page Part of the ROD (The Declaration) (Exhibit US1444, CMRP-AR053534-CMRP-AR053539), EPA summarizes the decision selecting a remedy consisting of the following major elements:

- Removal of potential buried waste material and off-site treatment or disposal of waste material in the Source Area (the peninsula of land where industrial activities occurred in the past) and the installation of a permanent hazardous waste cap over the Source Area;[9]

- Excavation and dewatering of sediments and floodplain soils in the Allendale and Lyman Mill portions of the Woonasquatucket River and placement of most of these sediments in an upland confined disposal facility  with the most contaminated sediments and floodplain soils shipped off-site for treatment or disposal;

- Placement of a thin layer cover over remaining contaminated sediment in the Oxbow wetland area;

- Implementation of institutional controls (i.e., land and groundwater use controls) to ensure long-term integrity of all remedy elements;

- Long-term monitoring of certain remedy elements;

- Wetlands and floodplain mitigation.

---

[9] Based on a study performed by a number of the third-party defendants, EPA no longer expects that the removal of waste material and off-site treatment or disposal will be necessary in the Source Area.

18

In the ROD, EPA explains its reasons for the selection of each element.

EPA made a finding in the ROD that the contamination at the Site may present an imminent and substantial endangerment to public health, welfare, or the environment. (Exhibit US1444, CMRP-AR058324 – CMRP-AR058325). EPA also made several statutory findings required by CERCLA including that the remedy will be protective of human health and the environment when fully implemented, even though the selected remedy will still leave in place some hazardous substances at the Site, and that the remedy is cost-effective. Id.

The ROD contains EPA's detailed responses to public comments from numerous stakeholders in its 103-page "Responsiveness Summary," Part 3 of the ROD. (Exhibit US1444, CMRP-AR053786 - CMRP-AR053788). The public, including Emhart, was invited to submit comments during two extended public comment periods following EPA's issuance of its Proposed Plan, and the Plan's Amendment. Comments on the Proposed Plan, and its Amendment, were accepted in writing and orally during public hearings. While each comment is included within the ROD administrative record, EPA did not reproduce the verbatim comments in the ROD Responsiveness Summary. Instead, EPA compiled or summarized the comments received by various topics, so that it could respond to similar comments on the same topic. Because EPA received so many comments from Emhart, EPA directly responded to each of these comments in the ROD Responsiveness Summary. (Exhibit US1444, CMRP-AR053815 - CMRP-AR053888). Comments received from Emhart, and which EPA considered and responded to in the ROD Responsiveness Summary include, but are not limited to:

- No evidence exists that Emhart's predecessor released dioxin at the Site. (Exhibit US1444, CMRP-AR053820);

- A disposal facility in the floodplain of the drained portions of Allendale or Lyman

Mill Ponds should be used to dispose of contaminated soils and sediments. (Exhibit US1444, CMRP-AR053834);

- An upland disposal facility should not be used to dispose of contaminated soils and sediments as an exact location has not been selected and sized, and such a facility would not be cost effective. (Exhibit US1444, CMRP-AR053838);

- The caps that are in place in portions of the Source Area do not need to be replaced with a cap designed to cover hazardous waste. (Exhibit US1444, CMRP-AR053862);

- The cleanup levels for the Site are unduly stringent because the risks to human health and the environment were not properly evaluated. Exhibit US1444, CMRP-AR053880);

At trial, Emhart may present or explain the comments on EPA's Proposed Plan, and the Plan Amendment, to the Court and in response, either in rebuttal or in post-trial briefing, the United States will refer to EPA's responses to any such comments contained in the ROD Responsiveness Summary.  If Emhart attempts to provide any information to the Court in this trial that was not presented to EPA during the public comment periods on the Proposed Plan, or the Plan Amendment, the United States intends to object to the introduction of such new information on the basis that this information was not presented to EPA during the public comment periods, and therefore it cannot factor into the Court's determination of whether EPA acted in an arbitrary and capricious manner in selecting the ROD.

### 3.  The Feasibility Study & Proposed Plan

The administrative record for the ROD contains the Feasibility Study, and the Proposed Plan for the Site, both of which were amended.  The documents themselves describe the remedial evaluation process undertaken, and at trial the United States will refer to these documents and

have witnesses testify to further explain these documents.

EPA's April 2010 Feasibility Study (Exhibit US1311) for the Site contains an Executive Summary section which highlights the purpose, methodology, and conclusions of the Study. (Exhibit US1311, CMRP-AR040565 - CMRP-AR042428). The purpose of the Feasibility Study is to develop and evaluate appropriate remedial alternatives to address contamination at the Site. EPA examined the risks that are presented by the contaminants at the Site, particularly from fish ingestion or contact with soils and sediments, as analyzed in the prior risk assessments, and then evaluated technologies that may be implemented to reduce or eliminate these risks. In addition, in conducting the Feasibility Study, EPA examined environmental requirements, such as Federal or State regulations, that must be complied with for on-site remedial actions. These can include cleanup standards and other substantive environmental protection requirements promulgated under Federal or State law. In the Feasibility Study, EPA also analyzed many options for dealing with contaminated soils and sediments, ranging from taking no action to complete excavation of soils and sediments, and also analyzed how to treat or dispose of contaminated soils and sediments including (1) confining removed materials on the Site in the floodplain, (2) removing these materials to an upland facility outside of the floodplain, (3) thermally treating the materials on site, and (4) shipping the materials to a licensed off-site disposal facility.

EPA screened out remedial alternatives in accordance with its remedial evaluation process, and then examined in further detail those options that remained, comparing them on the basis of several different criteria. In the Feasibility Study, EPA weighed options for the Site broken down by the separate contaminated areas, referred to as "Action Areas," including: Allendale and Lyman Mill Pond Sediments; Allendale Mill Floodplain Soil; Lyman Mill Stream Sediment and Floodplain Soil including the Oxbow wetlands; Source Area Soils; and

Groundwater.  EPA analyzed different cleanup options for each of these Action Areas in the Feasibility Study, in total analyzing over 30 different alternatives for the areas of the Site.

EPA issued an Addendum to the Feasibility Study in September, 2011 (Exhibit US1311) to reevaluate remedial alternatives that were possibly affected by work and further investigations at the Site.  EPA's prepared an executive summary of the results of the Addendum to the Feasibility (Exhibit US1311, CMRP-AR047056 - CMRP047061).  In the Addendum, EPA analyzed impacts on the alternatives from supplemental investigations in the Oxbow, the results of a peer review of the Site and EPA's proposed remedy, and work performed in 2009 in the footprint of the former Hexachlorophene manufacturing building to address groundwater in the Source Area – work that was the subject of extensive evidentiary submissions in Phase 1 of this trial.

Following its Feasibility Study, and Addendum thereto, EPA issued its Proposed Plan for the Site in October 2011 (Exhibit US1328).  In the Proposed Plan, EPA selected from the various options that were analyzed in detail during the Feasibility Study for each area of the Site.  In the 34-page Proposed Plan, EPA described to the public the remedial alternatives that EPA was proposing to select for each area of the Site.  In addition, the Proposed Plan provided notice of a number of public hearings regarding the Proposed Plan, and invited the public to submit comments both during these hearings and during a public comment period.

In February 2012, EPA released a nationwide change to EPA's non-cancer toxicity value for dioxin.  This revised non-cancer toxicity value for dioxin meant that EPA had to reevaluate the remedial alternatives it had selected in its October 2011 Proposed Plan.  In May 2012, EPA issued a Technical Memorandum - Impact of Dioxin Reassessment (Exhibit US1392), updating the human health risk assessment supporting the Remedial Investigation, the Feasibility Study,

and the October 2011 Proposed Plan.  Following this Technical Memorandum, EPA issued a

Proposed Plan Amendment in July 2012 (Exhibit US1393), modifying the original proposal by

expanding the extent of some of the areas that require cleanup.  Public hearings and a public

comment period were held for the Proposed Plan Amendment.

### B.    Issuance of Cleanup Order

The United States will prove that on June 10, 2014, EPA issued an "Administrative Order

for Remedial Design, Remedial Action, and Operation and Maintenance" for the Site (the

Cleanup Order) requiring Emhart and Black & Decker to begin cleanup work at the Site by

implementing the ROD.  The United States will prove that, when issuing the Cleanup Order,

EPA made a number of findings of fact and conclusions of law, including that the "actual and

threatened release of one or more hazardous substances from the facility may present an

imminent and substantial endangerment to the public health or welfare or the environment."

(Exhibit US1490, CMRP-AR058285 Cleanup Order at ¶ 81).  The United States will also prove

that EPA prepared an administrative record at the time it issued the Cleanup Order.   (Exhibit

US1490, See Cleanup Order, CMPR-AR058274 and CMRP-AR058302).  Because the Cleanup

Order requires Emhart and Black & Decker to begin performing the remedy contained in the

ROD, the administrative record prepared for the Cleanup Order includes both the administrative

record for the ROD (Exhibits US0600-US1462) as well as additional documents pertinent to the

Cleanup Order decision (Exhibit US1463-US1526).

### C.    Cleanup Order Violation Penalties & Damages

The United States will also introduce evidence from the time period after the Cleanup

Order was issued.  This evidence will document Emhart and Black & Decker's continued refusal

to comply with the Cleanup Order:

23

- Emhart's July 10, 2014, notification to EPA that they would not comply with the Cleanup Order (Exhibit US1546),

- EPA's October 26, 2015, letter requesting Emhart to reconsider its refusal to comply with the Cleanup Order in light of the Court's September 17, 2015, Findings of Facts and Conclusions of Law finding Emhart jointly and severally liable for the hazardous substances at the Site.[10]  (Exhibit US1552), and

- Emhart's March 10, 2016, letter in which Emhart claims that it continues to have a sufficient cause defense to the Cleanup Order and maintains its position that it need not comply with the Cleanup Order. (Exhibit US1545).

This evidence will show that Emhart has violated the Cleanup Order for 712 days, starting on June 10, 2014 through September 25, 2016, and that such violation of the Cleanup Order due to non-compliance may continue after such date.  This number of days of violation results in a maximum penalty of up to $30,490,017 under CERCLA.

In addition, the United States will present evidence that it incurred costs in the amount of $881,315 as a result of Emhart's failure to comply with the Cleanup Order, and the United States will argue that $881,315 is the minimum amount of punitive damages, and that this amount should be trebled to arrive at a total damages amount of $2,643,945.

After the United States presents evidence that Emhart has not complied with the Cleanup Order, the burden shifts to Emhart and Black & Decker to prove that they had a "sufficient cause" to refuse to comply with the Cleanup Order.  Emhart and Black & Decker's refusal to

---

[10] In its October 26, 2015 letter, EPA referred Emhart to Section 106(b)(2)(D) of CERCLA, which provides an avenue for Respondents who do comply with UAOs to seek reimbursement for response costs incurred, even if they are determined to be a liable party, if they can demonstrate on the administrative record that EPA's "decision in selecting the response action ordered was arbitrary and capricious or otherwise not in accordance with the law." 42 U.S.C. § 9606(b)(2)(D).

comply with the Cleanup Order should not be limited to analyzing their "sufficient cause" defense in only July 2014 when they informed EPA that they would not comply with the Cleanup Order. Instead, the analysis of any "sufficient cause" defense should include a consideration of whether Emhart and Black & Decker could still possibly maintain this defense after the Court issued its Findings of Fact and Conclusion of Law on September 17, 2015. Having been found jointly and severally liable for their past disposal of hazardous substances at the Site, Emhart and Black & Decker continued to maintain their position that they continued to have a "sufficient cause" to refuse to comply with the Cleanup Order.

The United States will argue that the Court should assess the maximum daily penalty for the total number of days that Emhart and Black & Decker have refused to comply with the June 10, 2014, Cleanup Order. This maximum penalty calculation is $30,490,017, plus $53,907 for each day from September 26, 2016 until the date Emhart and Black & Decker comply with the Cleanup Order. This amount is calculated as follows.

- There was a 481-day period from July 10, 2014 when Emhart and Black & Decker refused to comply with the Cleanup Order until November 2, 2015, when the Federal Civil Penalties Inflation Adjustment Act resulted in an increase in the daily civil penalty. For this 481-day period, the penalty is $37,500 a day, resulting in an $18,037,500 penalty.

- There was a 231-day period from November 3, 2015 until the day before the original date of the Phase 2 Trial start of June 21, 2016. For this 231-day period, the penalty is $53,907 a day resulting in a $12,452,517 penalty.

- By an agreement between the parties regarding their joint request to reschedule the start of this phase of trial, the United States is not seeking any penalties for the period

starting June 21, 2015 through September 25, 2015.

For any days of violation continuing from September 26, 2016 onward, the civil penalty is $53,907 per day.

The United States will also present evidence at trial regarding the $881,315 in costs it has incurred as a result of Emhart's refusal to comply with the Cleanup Order.  The United States will present this evidence solely as the basis for the Court to determine the amount of punitive damages to award under CERCLA Section 107(c)(3), 42 U.S.C. § 9607(c)(3), and will not present this evidence as a basis for it to recover any additional Past Costs as parties have stipulated to the amount of Past Costs subject to recovery at the conclusion of this case.

## III.     Proposed Witness List[11]

### A.     Fact Witnesses

The United States intends to call the following five fact witnesses during its case in chief. In addition, the United States may call one or more of these witnesses in rebuttal to witnesses that Emhart may call.

1.     <u>Mr. Edward Bazenas</u>: The On-Scene Coordinator at the Centredale Manor Site from 1999 to 2015, Mr. Bazenas, will provide testimony that will give the Court an understanding of how EPA considered the short- and long-term actions they were going to take from the beginning of EPA's involvement at the Site.  Mr. Bazenas will also underscore the discrete nature of EPA's removal actions as well as some of the temporary measures EPA employed at the Site, which will help highlight the importance of the permanent remedy selected by EPA.  He will also provide testimony that will show EPA worked with local residents to reduce the impact of EPA's extensive prior work at the Source Area, which supports EPA's

---

[11] In addition to the specific witnesses (both fact and expert) listed herein, the United States reserves the right to call, in either the first or third stage of trial, any witness listed on Black & Decker's proposed witness list.

position that the remedy selected for the Source Area Soil is implementable. Mr. Bazenas will also show how EPA worked with local, state, and federal stakeholders to ensure they remained informed of EPA's activities and to address their concerns with respect to the work that was done at the Site. Finally, Mr. Bazenas will provide the Court a description of each of the removal actions he was involved in and explain to the Court that although each removal action addressed threats from actual or threatened releases of hazardous substances that may have presented imminent and substantial endangerment to the public and to the environment, there may remain broader imminent and substantial endangerment to public health, welfare, or the environment by the contamination that remains on the Site.

2.    Ms. Deidre Dahlen: Ms. Dahlen is a project manager and senior research scientist with Battelle. Battelle is a subcontractor to the EPA's primary contractor for the Site, the U.S. Army Corps of Engineers. Battelle has been involved at the site since the early 2000's. Ms. Dahlen has worked on the Site throughout Battelle's involvement and is currently Battelle's project manager for the Site. Ms. Dahlen is expected to testify regarding Battelle's involvement at the Site, including Battelle's involvement developing and evaluating remedial action alternatives during the Feasibility Study; Battelle's involvement and participation in EPA's efforts to elicit input from the public at public meetings and hearings and the Marion Cox Dialogue; and Battelle's involvement in the post ROD work.

3.    Mr. Lou Maccarone: Mr. Maccarone, the Chief of Program Development at the Rhode Island Department of Environmental Management ("RIDEM"), was the RIDEM Project Manager for the Site from early 2002 through August 2016. Throughout his time at RIDEM, Mr. Maccarone has visited the Site many times. Mr. Maccarone is expected to testify about documents in the administrative record prepared by RIDEM, including the State's concurrence

with the remedy selected in the ROD and comments expressing the State's concern about the impermanence of the interim caps installed at the Site. In addition, he may testify about interim remediation measures that RIDEM contracted and oversaw pursuant to the Record of Decision for the Site. Mr. Maccarone may also testify about current conditions at the Site based on his observations during recent Site visits, including of overgrown vegetation on the interim caps, access points to contaminated areas along the Allendale and Lyman Mill Ponds, and signs of recreational use in contaminated areas.

4.     Melissa Taylor: Ms. Taylor is a Remedial Project Manager employed by EPA Region 1. She has been assigned to the Site since June of 2016. Ms. Taylor has become familiar with the Site by reviewing key documents in the administrative record for the Record of Decision, and the administrative record for the Administrative Order for Remedial Design, Remedial Action, and Operation and Maintenance for the Centredale Manor Restoration Project Superfund Site, issued by EPA on June 10, 2014. Ms. Taylor is expected to testify about the process of cleaning up a Superfund Site, the long term cleanup remedy selected by EPA for the Centredale Manor Site, as well as the Proposed Plan, the Proposed Plan Amendment, the public comment process, internal oversight, community involvement in the remedy selection, and implementation of the remedy.

5.     Ms. Joan Buonopane: Ms. Buonopane is employed by EPA Region 1 as a Cost Recovery Specialist and Budget Coordinator and is expected to testify about how EPA tracks costs the United States has incurred related to the Cleanup Order and the amount of those costs.

**B.     Expert Witnesses**

The United States may call the following three expert witnesses in rebuttal to witnesses that Emhart may call.

1.      Mr. John Gardner:  Mr. Gardner serves as Vice President and Senior Project Manager at Smith Gardner, Inc. in North Carolina.  He holds a B.S. in Civil Engineering from the University of Pittsburgh and is licensed to practice engineering in several states.  His experience is primarily in the areas of civil engineering with a specific focus on geotechnical engineering, waste management and related fields with particular emphasis in siting, permitting, design, construction, operation, closure and post-closure monitoring of waste management facilities including municipal, construction/demolition, industrial, and residual waste landfills.  If necessary to rebut portions of the testimony of Jeffrey Loureiro, who as the expert for Emhart criticized EPA's selected remedy, Mr. Gardner may testify that many of the criticisms Mr. Loureiro raises with EPA's selected remedy are not appropriate to address during the Feasibility Study stage and are more appropriate to address during the pre-design and design phases, that the selected remedy for the source area is technically feasible and implementable with no significant increase in costs from those presented in the ROD, and that the selected remedy for managing sediments and soils from the ponds, river reaches, and floodplain areas is implementable with no significant increase in the expected timeframe or estimated costs from those presented in the ROD.

2.      Dr. Donna Vorhees:   Dr. Vorhees is a scientist specializing in conducting deterministic and probabilistic exposure and risk modeling for chemicals, such as polychlorinated biphenyls, dioxins, furans, petroleum hydrocarbons, volatile organic compounds, and metals such as arsenic, lead, and mercury.  Her work focuses on multi-pathway exposure assessment and human health risk assessment of chemicals in indoor and outdoor environments. If necessary for rebuttal, Dr. Vorhees will testify that EPA's Baseline Human Health Risk Assessment was performed in accordance with applicable regulations and guidance and that EPA

used acceptable professional judgment to perform the work in the Baseline Human Health Risk Assessment.  Dr. Vorhees will testify that the Baseline Human Health Risk Assessment contains the information EPA needed to select the remedy for the Site.  Finally, Dr. Vorhees will provide rebuttal testimony, as needed, to specific criticisms by Dr. Russell Keenan, regarding EPA's decisions in its Baseline Human Health Risk Assessment.

        3.      <u>Dr. Jerome Cura</u>:  As an ecological risk assessor at the Woods Hole Group and adjunct professor at Cape Cod Community College, Dr. Cura is an expert in ecological risk assessments, particularly concerning CERCLA and RCRA sites (including industrial and government facilities).  If necessary to rebut the testimony of Dr. Russell Keenan, who as the expert for Emhart criticized EPA's Baseline Ecological Risk Assessment for being inadequate to assess the risk at the Site thereby undermining its use to select an appropriate remedy, Dr. Cura may testify that EPA's risk assessment was conducted within the standard of practice in the industry and conformed to EPA's risk assessment guidance and policies.  He will also likely testify that what Dr. Keenan is advocating is an aspirational approach that is not required by EPA guidance in conducting an ecological risk assessment.  Beyond that, Dr. Cura will be prepared to rebut some other minor claims that Dr. Keenan made in his report, such as identifying particular information and data that Dr. Keenan asserted was missing from the ecological risk assessment.

## IV.    **Proposed Exhibits**

        During Phase I of this trial, the United States marked as Exhibits, US001 - US543, many of which were moved into evidence.  During this phase, the United States intends to move into evidence the administrative record for the ROD and the Cleanup Order.  The administrative record for the ROD has been labelled as exhibits "US0600 – US1462", and the administrative record for the Cleanup Order includes the administrative record for the ROD and additional

documents labelled as exhibits "US1463 - US1526." Therefore, exhibits US0600 – US1462 encompass the administrative record for the ROD, and exhibits US0600 – US1526 encompass the administrative record for the Cleanup Order. These administrative records were certified by EPA as complete and previously provided to the Court in November 2015, but were not numbered as exhibits at that time.

In addition, in its case in chief, and in rebuttal to Emhart witnesses, the United States may seek to introduce into evidence additional exhibits that have been pre-marked as exhibits "US1527" and up.

References to any exhibits with the Bates number US600 and higher in this memorandum refer to potential Exhibits to be introduced by the United States at trial. As of the time of the filing of this memorandum the parties have not reached any final stipulation regarding the admissibility of any exhibits for this phase of the trial.

All administrative record exhibits, and additional pre-marked potential exhibits will be provided to the Court electronically and in hard copy as further directed by the Court.

**V.    Trial Schedule**

The United States is prepared to present its case and conduct the trial on the schedule proposed by the Court.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

Dated:  September 15, 2016          */s/ Jerome MacLaughlin*
JEROME W. MACLAUGHLIN
MYLES E. FLINT, II
LAURA J. ROWLEY
RICHARD S. GREENE
Attorneys

Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, DC   20044-7611
Telephone:     (202) 616-7162
Facsimile:     (202) 616-2427
E-Mail:        jerry.maclaughlin@usdoj.gov


PETER F. NERONHA
United States Attorney

RICHARD MYRUS
Assistant United States Attorney
District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
Telephone:     (401) 709-5000
Facsimile:     (401) 709-5017
E-Mail:        richard.myrus@usdoj.gov