# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

EMHART INDUSTRIES, INC.

Plaintiff, Cross-Plaintiff, Third-Party Plaintiff, and Counter-Defendant

v.

NEW ENGLAND CONTAINER COMPANY, INC. *ET AL.*

Defendants, Counter-Plaintiffs, and Third-Party Plaintiffs

Civil Action No. 06-218-S

---

EMHART INDUSTRIES, INC.

Plaintiff, Cross-Plaintiff, Third-Party Plaintiff, and Counter-Defendant

v.

UNITED STATES DEPARTMENT OF THE AIR FORCE *ET AL.*

Defendants, Counter-Plaintiffs, Cross-Plaintiffs, and Third-Party Plaintiffs

v.

BLACK & DECKER INC.

Counter-Plaintiff, Cross-Plaintiff, Third-Party Plaintiff, and Third-Party Defendant

v.

A. HARRISON & CO., INC.; EASTERN COLOR & CHEMICAL CO.; EASTERN RESINS CORP.; HENKEL CORP.; HEXAGON METROLOGY, INC.; INDUSOL, INC.; IVAX LLC; OLIN CORP.; PHIBRO ANIMAL HEALTH CORP.

Civil Action No. 11-023-S

CONSOLIDATED

Third-Party Defendants )
)
v. )
)
BNS LLC; CNA HOLDINGS LLC; CRANSTON PRINT WORKS CO.; DURO TEXTILES LLC; ELI LILLY & CO.; EXXON MOBIL CORP.; ORGANIC DYESTUFFS CORP.; SEQUA CORP.; TEKNOR APEX CO.; THE ORIGINAL BRADFORD SOAP WORKS, INC.; UNION OIL COMPANY OF CALIFORNIA ) ) ) ) ) ) ) )
)
Cross-Defendants )
)
v. )
)
BASF CORP. )
)
Cross-Defendant and Fourth-Party Plaintiff ) )
)
v. )
)
ROHM AND HAAS COMPANY )
)
Fourth-Party Defendant )
)
v. )
)
EVANS PLATING CORPORATION )
)
50 Waterman Ave. )
P.O. Box 113856 )
North Providence, RI 02911 )
)
Third-Party Defendant )
)
<u>*Serve on*</u>: )
Clifford C. Blanchard, Jr. )
50 Waterman Ave. )
P.O. Box 113856 )
North Providence, RI 02911 )
)
)
)

GREYSTONE INCORPORATED

One Greystone Drive
North Providence, RI 02911

Third-Party Defendant

*Serve on*:
National Registered Agents, Inc.
450 Veterans Memorial
Parkway, Suite 7A
East Providence, RI 02914

INDUPLATE INC.

7 Wellington Road
Lincoln, RI 02865

Third-Party Defendant

*Serve on*:
National Registered Agents, Inc.
450 Veterans Memorial
Parkway, Suite 7A
East Providence, RI 02914

INDUPLATE OPERATIONS, LLC

7 Wellington Road
Lincoln, RI 02865

Third-Party Defendant

*Serve on*:
National Registered Agents, Inc.
450 Veterans Memorial
Parkway, Suite 7A
East Providence, RI 02914

THE WORCESTER COMPANY, INC.

One Greystone Avenue
North Providence, RI 02911

Third-Party Defendant

*Serve on*:
Malcolm Farmer III
Hinkley, Allen & Snyder LLP
100 Westminster Street, Suite 1500
Providence, RI 02903

STATE OF RHODE ISLAND, by and through the RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

Plaintiff

v.

BLACK & DECKER INC. AND EMHART INDUSTRIES, INC.

Defendants

Civil Action No. 18-316-S

CONSOLIDATED

**SECOND AMENDED THIRD-PARTY COMPLAINT AND CROSS-CLAIM**

Emhart Industries, Inc. and Black & Decker Inc. (collectively, "Emhart") file this Second Amended Third-Party Complaint and Cross-Claim ("SAC") and allege as follows:

**INTRODUCTION**

1. The claims at issue in this SAC arise from environmental harm that Emhart is actively remediating at the Centredale Manor Restoration Project Superfund Site (the "Site").

2. The Third-Party Defendants and Cross-Defendants named in this SAC (collectively, "Defendants") fall into three general categories:

a. Parties who sent and/or whose predecessors sent used drums to the Site for reconditioning that contained hazardous substances that were then released to the Site. Defendants in this category are: A. Harrison & Co., Inc.; BASF Corporation; BNS LLC; CNA Holdings LLC; Cranston Print Works Company; Duro Textiles LLC; Eastern Color & Chemical Co.; Eastern Resins Corporation; Exxon Mobil Corporation; Henkel Corporation; Hexagon Metrology, Inc.; Indusol, Inc.; IVAX LLC; Olin Corporation; Organic Dyestuffs Corporation; Phibro Animal Health Corporation; Sequa Corporation; Teknor Apex Company; The Original Bradford Soap Works, Inc.; Union Oil Company of California; and The Worcester Company, Inc. (collectively, the "NECC Customer Defendants"[1]).

b. Parties who owned and/or operated, and/or whose predecessors owned and/or operated, facilities along the Woonasquatucket River upstream of the Site that released hazardous substances to the River that ultimately came to be located at the Site. Defendants in this category are: BNS LLC; Evans Plating Corporation; Greystone

[1] References to NECC Customer Defendants in this SAC are intended to include predecessors, where applicable.

Incorporated; Hexagon Metrology, Inc.; Induplate Inc.; Induplate Operations, LLC; and The Worcester Company, Inc. (collectively, the "Upstream Defendants"[2]).

c. One party who directed, controlled, specified, and participated in certain operations at the Site that resulted in releases of hazardous substances to the Site: Eli Lilly and Company.

3. Emhart asserts these third-party claims and cross-claims under sections 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(f), for cost recovery and contribution from each Defendant for response costs Emhart has incurred or will incur in connection with the remediation of the Site. Emhart also seeks a declaration, pursuant to 28 U.S.C. § 2201 and CERCLA section 113(g), 42 U.S.C. § 9613(g), as to each Defendant's liability and an allocation of past and future response costs among all parties.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over the claims asserted in this SAC pursuant to CERCLA section 113(b), 42 U.S.C. § 9613(b), because these claims involve controversies arising under CERCLA, and 28 U.S.C. § 1331 because these claims arise under the laws of the United States.

5. Venue lies in this Court pursuant to CERCLA section 113(b), 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) because the releases or threatened releases of hazardous substances that gave rise to this SAC occurred in this District, and because the Site is located in this District.

6. The Court has personal jurisdiction over each Defendant because each resides in this District, maintains such minimum contacts with this District, and/or engages in continuous

[2] References to Upstream Defendants in this SAC are intended to include predecessors, where applicable.

and systematic activity in this District such that assertion of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

## PARTIES

### Third-Party Plaintiff & Cross-Plaintiff

7. Third-Party Plaintiff / Cross-Plaintiff is Emhart.

### Third-Party Defendants & Cross-Defendants

8. Third-Party Defendant A. Harrison & Co., Inc. ("A. Harrison") is legally responsible for the Site-related liabilities arising from its operations.

9. A. Harrison is a Rhode Island corporation with its principal place of business in North Providence, Rhode Island.

10. A. Harrison is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

11. Cross-Defendant BASF Corp. ("BASF") is legally responsible for the Site-related liabilities arising from the operations of Ciba-Geigy Corp. and its predecessors, Geigy Chemical Corp. and Alrose Chemical Corp. (collectively, the "Geigy Companies"), and Paragon Chemicals, Inc. ("Paragon Chemicals").

12. BASF is a Delaware corporation with its principal place of business in Florham Park, New Jersey.

13. BASF, Ciba-Geigy Corp., Geigy Chemical Corp., Alrose Chemical Corp., and Paragon Chemicals each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

14. Cross-Defendant BNS LLC ("BNS") is legally responsible for the Site-related liabilities arising from the non-metrology operations of Brown & Sharpe Manufacturing Co.

("Brown & Sharpe") and from operations at facilities Brown & Sharpe has owned along the Woonasquatucket River upstream of the Site.

15. BNS is a Delaware corporation with its principal place of business in North Kingstown, Rhode Island.

16. Third-Party Defendant Hexagon Metrology, Inc. ("Hexagon") is legally responsible for the Site-related liabilities arising from the metrology operations of Brown & Sharpe and from operations at facilities Brown & Sharpe has owned along the Woonasquatucket River upstream of the Site.

17. Hexagon is a Delaware corporation with its principal place of business in North Kingstown, Rhode Island.

18. BNS, Hexagon, and Brown & Sharpe each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

19. Cross-Defendant CNA Holdings LLC ("CNA Holdings") is legally responsible for the Site-related liabilities arising from the operations of American Hoechst Corp. ("American Hoechst").

20. CNA Holdings is a Delaware limited liability company with its principal place of business in Summit, New Jersey.

21. CNA Holdings and American Hoechst each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

22. Cross-Defendant Cranston Print Works Co. ("Cranston Print Works") is legally responsible for Site-related liabilities arising from its operations and the operations of Bercen Chemical Co. ("Bercen Chemical").

23. Cranston Print Works is a Rhode Island corporation with its principal place of business in Cranston, Rhode Island.

24. Cranston Print Works and Bercen Chemical each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

25. Cross-Defendant Duro Textiles LLC ("Duro Textiles") is legally responsible for the Site-related liabilities arising from the operations of Duro Finishing Corp. ("Duro Finishing").

26. Duro Textiles is a Delaware limited liability company with its principal place of business in Fall River, Massachusetts.

27. Duro Textiles and Duro Finishing each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

28. Third-Party Defendant Eastern Color & Chemical Co. ("Eastern Color & Chemical") is legally responsible for the Site-related liabilities arising from its operations.

29. Eastern Color & Chemical is a Rhode Island corporation with its principal place of business in Providence, Rhode Island.

30. Eastern Color & Chemical is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

31. Third-Party Defendant Eastern Resins Corp. ("Eastern Resins") is legally responsible for the Site-related liabilities arising from the operations of Cardinal Chemical Co. ("Cardinal Chemical").

32. Eastern Resins is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.

33. Eastern Resins and Cardinal Chemical each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

34. Cross-Defendant Eli Lilly and Company ("Eli Lilly") is legally responsible for the Site-related liabilities arising from its operations.

35. Eli Lilly is an Indiana corporation with its principal place of business in Indiana.

36. Eli Lilly is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

37. Third-Party Defendant Evans Plating Corporation ("Evans Plating") is legally responsible for the Site-related liabilities arising from its operations and from operations at facilities Evans Plating has owned along the Woonasquatucket River upstream of the Site.

38. Evans Plating is a Rhode Island corporation with its principal place of business in North Providence, Rhode Island.

39. Evans Plating is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

40. Cross-Defendant Exxon Mobil Corp. ("Exxon") is legally responsible for the Site-related liabilities arising from the operations of Esso Standard Oil Co. ("Esso Oil").

41. Exxon is a New Jersey corporation with its principal place of business in Virginia.

42. Exxon and Esso Oil each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

43. Third-Party Defendant Greystone Incorporated f/k/a Greystone Enterprises, Inc. f/k/a Induplate Incorporated ("Greystone") is legally responsible for the Site-related liabilities arising from its operations; from the operations of all of its predecessors that historically operated along the Woonasquatucket River upstream of the Site, including, without limitation, The Industrial Plating Company, Industrial Plating, Inc., and U.S. Ring Traveler Company

(collectively, with Greystone, the "Greystone Companies"); and from operations at facilities the Greystone Companies have owned along the Woonasquatucket River upstream of the Site.

44. Greystone is a Rhode Island corporation with its principal place of business in North Providence, Rhode Island.

45. Greystone and the Greystone Companies are each "persons" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

46. Third-Party Defendant Henkel Corp. ("Henkel") is legally responsible for the Site-related liabilities arising from the operations of Charles S. Tanner & Co. ("Tanner").

47. Henkel is a Delaware corporation with its principal place of business in Rocky Hill, Connecticut.

48. Henkel and Tanner each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

49. Third-Party Defendant Induplate Inc. ("Induplate") is legally responsible for the Site-related liabilities arising from its operations and from operations at facilities Induplate has owned along the Woonasquatucket River upstream of the Site.

50. Induplate is a Rhode Island corporation with its principal place in Lincoln, Rhode Island.

51. Induplate is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

52. Third-Party Defendant Induplate Operations, LLC ("Induplate Operations") is legally responsible for the Site-related liabilities arising from its operations and from operations at facilities Induplate Operations has owned along the Woonasquatucket River upstream of the Site.

53. Induplate Operations is a Rhode Island corporation with its principal place of business in North Providence, Rhode Island.

54. Induplate Operations is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

55. Third-Party Defendant Indusol, Inc. ("Indusol") is legally responsible for the Site-related liabilities arising from the operations of Industrial Solvents & Chemicals, Inc. ("Industrial Solvents & Chemicals").

56. Indusol is a Massachusetts corporation with its principal place of business in Sutton, Massachusetts.

57. Indusol and Industrial Solvents & Chemicals each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

58. Third-Party Defendant IVAX LLC ("IVAX") is legally responsible for the Site-related liabilities arising from the operations of U.S. Oil Co. ("U.S. Oil").

59. IVAX is a Florida limited liability company with its principal place of business in Weston, Florida.

60. IVAX and U.S. Oil each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

61. Third-Party Defendant Olin Corp. ("Olin") is legally responsible for the Site-related liabilities arising from the operations of Wayland Chemical Co. ("Wayland Chemical").

62. Olin is a Virginia corporation with its principal place of business in Clayton, Missouri.

63. Olin and Wayland Chemical each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

64. Cross-Defendant Organic Dyestuffs Corp. ("Organic Dyestuffs") is legally responsible for the Site-related liabilities arising from the operations of Organic Chemical Co. ("Organic Chemical").

65. Organic Dyestuffs is a Rhode Island corporation with its principal place of business in East Providence, Rhode Island.

66. Organic Dyestuffs and Organic Chemical each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

67. Third-Party Defendant Phibro Animal Health Corp. ("Phibro") is legally responsible for the Site-related liabilities arising from the operations of Philipp Brothers Chemicals, Inc. ("Philipp Brothers Chemicals").

68. Phibro is a Delaware corporation with its principal place of business in Ridgefield Park, New Jersey.

69. Phibro and Philipp Brothers Chemicals each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

70. Cross-Defendant Sequa Corp. ("Sequa") is legally responsible for the Site-related liabilities arising from the operations of Warwick Chemical Co. ("Warwick Chemical") and Sun Chemical Corp. ("Sun Chemical") (collectively, the "Warwick Companies").

71. Sequa is a Delaware corporation with its principal place of business in Hackensack, New Jersey.

72. Sequa, Warwick Chemical, and Sun Chemical each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

73. Cross-Defendant Teknor Apex Co. ("Teknor Apex") is legally responsible for the Site-related liabilities arising from its operations and the operations of its predecessors, Thompson

Chemical Co., Thompson Apex Co., and Continental Oil Co. (collectively, with Teknor Apex, the "Teknor Companies").

74. Teknor Apex is a Delaware corporation with its principal place of business in Pawtucket, Rhode Island.

75. Teknor Apex, Thompson Chemical Co., Thompson Apex, and Continental Oil Co. each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

76. Cross-Defendant The Original Bradford Soap Works, Inc. ("New Original Bradford") is legally responsible for the Site-related liabilities arising from the operations of Original Bradford Soap Works, Inc. ("Original Bradford").

77. New Original Bradford is a Rhode Island corporation with its principal place of business in West Warwick, Rhode Island.

78. New Original Bradford and Original Bradford each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

79. Cross-Defendant Union Oil Company of California ("Union Oil") is legally responsible for the Site-related liabilities arising from the operations of American Mineral Spirits Co. ("AMSCO") and its successors, Pure Oil Co. and Union AMSCO (collectively, the "AMSCO Companies").

80. Union Oil is a California corporation with its principal place of business in San Ramon, California.

81. Union Oil, AMSCO, Pure Oil Co., and Union AMSCO each is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

82. Third-Party Defendant The Worcester Company, Inc. f/k/a Worcester Textile Company ("Worcester Company") is legally responsible for the Site-related liabilities arising from

its operations and from operations at facilities Worcester Company has owned along the Woonasquatucket River upstream of the Site.

83. Worcester Company is or was a Rhode Island corporation with its principal place of business in North Providence, Rhode Island.

84. Worcester Company is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

**<u>SITE, ADMINISTRATIVE, AND PROCEDURAL BACKGROUND</u>**

**The Site**

85. Emhart's claims in this SAC arise from CERCLA liability for the Site.

86. The Site is located at 2072 and 2074 Smith Street and encompasses parts of two Rhode Island towns, North Providence and Johnston. It includes a peninsula to the south of Smith Street—which is bordered to the west by the Woonasquatucket River and to the east by an abandoned mill tailrace—as well as surface water, sediment, and floodplain areas of the Woonasquatucket River from Route 44 southerly to the Allendale Dam and further below to the Lyman Mill Dam, including all contaminated areas within this area and any other locations in which contamination from this area has come to be located or from which that contamination came.

**New England Container Company's Operations at the Site**

87. New England Container Company, Inc. ("NECC") operated an incinerator-based wooden barrel and steel drum (collectively, "drum" or "drums") reconditioning facility on a portion of the Site from 1952 until approximately 1972.

88. During this period, NECC received drums containing chemical residues for recycling and/or refurbishing from a number of companies, including, but not limited to, A. Harrison, American Hoechst, the AMSCO Companies, Bercen Chemical, Brown & Sharpe, Cardinal Chemical, Cranston Print Works, Duro Finishing, Eastern Color & Chemical, the Geigy

Companies, Exxon, Industrial Solvents & Chemicals, Organic Chemical, Paragon Chemicals, Philipp Brothers Chemicals, Tanner, the Teknor Companies, U.S. Oil, the Warwick Companies, and Wayland Chemical.

89. NECC's facility was located in the central portion of the Centredale peninsula.

90. NECC used the southern portion of the peninsula as a dump for drums received and waste generated as part of its drum reconditioning operation at the Site.

91. NECC burned chemical residues contained in drums it received from its customers.

92. NECC deposited chemical residues contained in drums it received from its customers throughout the Site.

93. NECC dumped chemical residues contained in drums it received from its customers onto the peninsula soil.

94. NECC dumped chemical residues contained in drums it received from its customers into a surface impoundment located on the peninsula.

95. NECC dumped chemical residues contained in drums it received from its customers into the tailrace located to the east of the peninsula.

96. NECC dumped chemical residues contained in drums it received from its customers into the Woonasquatucket River.

97. NECC drained wastes from certain portions of its drum reconditioning operations at the Site onto the peninsula soil.

98. NECC drained wastes from certain portions of its drum reconditioning operations at the Site into a surface impoundment located on the peninsula.

99. NECC drained wastes from certain portions of its drum reconditioning operations at the Site into the tailrace located to the east of the peninsula.

100. NECC drained wastes from certain portions of its drum reconditioning operations at the Site into the Woonasquatucket River.

**Operations Upstream of the Site**

101. A number of companies have historically owned and/or operated facilities along the Woonasquatucket River upstream of the Site, including, but not limited to, the Upstream Defendants.

102. Many different materials have been used, produced, and/or handled at these facilities over time, including hazardous substances found at the Site.

103. Throughout the course of the Upstream Defendants' ownership of and operations at their respective upstream facilities, the materials used, produced, and/or handled at the facilities were released into the Woonasquatucket River.

104. For example, some of the materials used, produced, and/or handled at the Upstream Defendants' upstream facilities were directly discharged into the Woonasquatucket River.

105. Some of the materials used, produced, and/or handled at the Upstream Defendants' upstream facilities were also released into the environment surrounding the facilities. These materials were then deposited into the Woonasquatucket River through erosion and runoff from rainwater, snowfall, and/or periodic flooding events.

106. The materials used, produced, and/or handled at the Upstream Defendants' upstream facilities and released to the Woonasquatucket River were then transported downstream by the River and ultimately deposited in riverbanks, sediments, soils, and wetlands at the Site.

**EPA Investigation and Enforcement Activities at the Site**

107. Since 1996, the Environmental Protection Agency ("EPA") has undertaken numerous investigations of soil, groundwater, sediment, surface water, and biota in connection with the Site.

108. The investigations have indicated the presence of various contaminants—including dioxins (primarily 2,3,7,8-tetrachlorodibenzo-*p*-dioxin ("2,3,7,8-TCDD")), furans, polychlorinated biphenyls ("PCBs"), pesticides, volatile organic compounds ("VOCs"), semivolatile organic compounds ("SVOCs"), and metals—in Site-related soil, groundwater, sediment, surface water, and biota.

109. EPA has concluded that the presence and concentration patterns of these contaminants are consistent with the historical account of waste handling on the peninsula.

110. From 1999 to 2009, EPA issued more than one hundred 104(e) information request letters to former customers of NECC, potential successors to former customers of NECC, and companies that operated or have previously operated along the Woonasquatucket River.

111. During that period, EPA identified over thirty parties who were, according to EPA, potentially responsible for the contamination found at the Site (the "Potentially Responsible Parties" or "PRPs").

112. During that period, EPA also sent Notice of Potential Liability letters to a number of those PRPs, including, among others, Emhart, NECC, Brook Village Associates, L.P. ("Brook Village Associates"), Centredale Manor Associates, L.P. ("Centredale Manor Associates"), Crown-Metro, Inc. ("Crown-Metro"), A. Harrison, American Hoechst, AMSCO, BNS, Cranston Print Works, Duro Textiles, Eastern Color & Chemical, Eastern Resins, Eli Lilly, Exxon, Geigy, Indusol, New Original Bradford, Northeast Products Co. (as the incorrect successor in interest to U.S. Oil), Olin, Organic Dyestuffs, Phibro Animal Health, Teknor Apex, the United States Navy, the United States Air Force, Univar, and Warwick Chemical.

113. Since 2000, various entities identified by EPA as PRPs have performed work on and/or paid costs for multiple response actions, including:

a. A Time Critical Removal Action ("TCRA") (which had been partially performed by EPA between May and December 1999) in 2000, which was performed and paid for pursuant to a Unilateral Administrative Order ("UAO") issued by EPA on April 12, 2000, to Emhart, Brook Village Associates, Centredale Manor Associates, Crown-Metro, and NECC;

b. A Non-Time Critical Removal Action ("NTCRA") between 2001 and 2003 pursuant to a UAO issued by EPA on March 26, 2001, to Emhart, Brook Village Associates, Centredale Manor Associates, Crown-Metro, and NECC;

c. A second TCRA between 2003 and 2006, which was performed and paid for pursuant to an Administrative Order on Consent ("AOC") entered into by EPA and ten PRPs[3] on September 11, 2003;

d. An investigation and study regarding the Site between 2007 and 2010, which was performed and paid for pursuant to an AOC entered into by EPA and Emhart on September 25, 2007;

e. A third TCRA between 2009 and 2010, which was performed and paid for pursuant to an AOC entered into by EPA and Emhart on August 6, 2009; and

f. An investigation of certain portions of the Site from 2010 to 2013, which was performed and paid for pursuant to an AOC entered into by EPA and Emhart on June 29, 2010.

[3] The ten PRPs that entered into the September 11, 2003 AOC included Emhart, NECC, Brook Village Associates, Centredale Manor Associates, AMSCO, Cranston Print Works, CNA Holdings, Sequa, New Original Bradford, and Teknor Apex. EPA also issued a UAO on October 8, 2003, ordering that two additional PRPs—Ciba Specialty Chemicals Corp. and Organic Dyestuffs—participate in the performance of the TCRA.

114. Emhart is the only PRP that has participated in each of these prior response actions, and Emhart has incurred reasonable and necessary response costs in carrying out such response actions.

115. On September 28, 2012, EPA issued a Record of Decision ("ROD") for the Site, setting forth the final remedy it selected to address the contamination found at the Site.

116. On June 10, 2014, EPA issued a UAO ordering Emhart, and Emhart only, to perform the remedy set forth in the September 28, 2012 ROD.

117. By letter dated July 10, 2014, Emhart informed EPA that it had "sufficient cause" to refuse to comply with the June 10, 2014 UAO.

**Site-Related Litigation**

118. On May 6, 2005, the United States commenced a civil action in this Court against Brook Village Associates and Centredale Manor Associates seeking response costs under CERCLA section 107(a). (Civil Action No. 05-0195-ML, ECF No. 1.)

119. On May 11, 2006, Emhart commenced a civil action in this Court against NECC seeking, among other things, recovery of response costs under CERCLA section 107(a) and contribution under CERCLA section 113(f)(1). (ECF No. 218:1.[4])

120. On November 7, 2006, the United States entered into a consent decree with Brook Village Associates, under which Brook Village Associates agreed to pay $1,451,936.00 to resolve its liability for the Site. (Civil Action No. 05-0195-ML, ECF No. 64.)

[4] As explained below, Emhart engaged in litigation regarding the Site with both NECC and the United States, and the Court ultimately consolidated the litigation between Emhart and NECC (Civil Action No. 06-218) and the litigation between Emhart and the United States (Civil Action No. 11-023-S). The docket for Civil Action No. 06-218 will be cited to herein as "ECF No. 218:#," and the docket for Civil Action No. 11-023-S will be cited to herein as "ECF No. 23:#."

121. On November 7, 2006, the United States also entered into a consent decree with Centredale Manor Associates, under which Centredale Manor Associates agreed to pay $2,311,364.00 to resolve its liability for the Site. (Civil Action No. 05-0195-ML, ECF No. 65.)

122. On September 17, 2007, NECC filed a Counterclaim against Emhart seeking, among other things, recovery of response costs under CERCLA section 107(a). (ECF No. 218:58.)

123. On January 26, 2011, Emhart commenced a separate civil action against the United States of America (the "United States"), including the United States Navy, the United States Air Force, and the Department of Defense, seeking, among other things, recovery of response costs under CERCLA section 107(a) and contribution under CERCLA section 113(f)(1). (ECF No. 23:1, 13, 69.)

124. On February 13, 2012, the United States filed a Counterclaim against Emhart seeking contribution under CERCLA section 113(f)(1) and recovery of response costs under CERCLA section 107(a). (ECF No. 23:32, 66, 74.)

125. On February 24, 2012, the United States filed a Third-Party Complaint against Black & Decker Inc. ("Black & Decker"), as successor to Emhart. (ECF No. 23:34.)

126. By order dated July 2, 2012, the Court consolidated the litigation between Emhart and the United States (Civil Action No. 11-023-S) with the ligation between Emhart and NECC (Civil Action No. 06-218).

127. On September 28, 2012, the United States filed a Cross-Claim against NECC. (ECF No. 23:67.)

128. On September 28, 2012, the United States filed a Third-Party Complaint against BASF, BNS, CNA Holdings, Cranston Print Works, Duro Textiles, Eli Lilly, Exxon, Organic Dyestuffs, Sequa, Teknor Apex, New Original Bradford, and Unocal Corp. (ECF No. 23:65.)

129. The United States filed an Amended Third-Party Complaint on December 18, 2012, replacing Unocal Corp. with Union Oil. (ECF Nos. 23:112, 113, 115.)

130. On October 30, 2012, NECC filed a Third-Party Complaint against Cal Chemical Corp., Eastern Resins, Eastern Color & Chemical, Tanner Industries, Inc., Northeast Products Co., and Woburn Steel Drum, Inc. (ECF No. 218:261.)

131. NECC filed a second Third-Party Complaint against Univar on November 12, 2012. (ECF No. 23:80.)

132. NECC voluntarily dismissed Northeast Products Co. on January 2, 2013, and Tanner Industries, Inc. on April 4, 2013. (ECF No. 23:115, 121.)

133. On January 2, 2013, the Court issued the Second Revised Case Management Order, in which it stayed the claims pending at that time against the third-party defendants named in the Third-Party Complaints filed by NECC and the United States. (ECF No. 23:116.)

134. On April 10, 2015, the United States lodged a consent decree with the Court, under which the United States and NECC agreed to dismiss their respective claims against one another upon NECC's payment of $8,750,000.00 to the United States. (ECF No. 23:354.)

135. On April 14, 2015, the United States filed an Amended Counterclaim against Emhart seeking, in addition to its claims for contribution and cost recovery, enforcement under CERCLA section 106(a) of the June 10, 2014 UAO that ordered Emhart to perform the remedy set forth in the ROD, penalties under CERCLA section 106(b), and punitive damages under CERCLA section 107(c)(3). (ECF No. 23:357.)

136. On April 16, 2015, NECC voluntarily dismissed its claims against Univar, Eastern Color & Chemical, and Woburn Steel Drum, Inc. (ECF No. 218:541.)

137. By stipulation entered on May 1, 2015, Emhart and Black & Decker dismissed their claims against NECC, and NECC dismissed its claims against Emhart and Black & Decker. (ECF No. 23:362.)

138. This Court held the Phase I trial from May 18, 2015, through July 22, 2015. The Phase I trial addressed Emhart's liability for contamination of the Site and the divisibility of Emhart's liability (if proven), and also heard evidence pertaining to the United States' liability for that contamination. (*See* Eighth Revised Case Management Order, ECF No. 218:470.)

139. In the Court's September 17, 2015 Phase I Findings of Fact and Conclusions of Law (ECF No. 23:405), the Court found Emhart jointly and severally liable for the contamination of the Site under CERCLA section 107(a), 42 U.S.C. § 9607(a). The Court also found that the record did not demonstrate, by a preponderance of the evidence, that the United States was liable for the contamination of the Site, and therefore granted the United States' motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c).

140. This Court held the Phase II trial from September 27, 2016, through January 19, 2017. The Phase II trial addressed the United States' claim against Emhart for response costs incurred at the Site through September 30, 2015, whether the remedy selected for the Site is consistent with the NCP and CERCLA, and whether Emhart had sufficient cause to support its noncompliance with the June 10, 2014 UAO that ordered Emhart to perform the remedy selected in the ROD.

141. On September 13, 2016, Emhart and the United States entered into a stipulation regarding the amount of the United States' past response costs (the "Stipulation"). (ECF No. 23:444.) Pursuant to the Stipulation, Emhart agreed to pay $32,000,000.00 in past response costs (including both direct and indirect costs) to the United States following the entry of a final

judgment holding Emhart liable under CERCLA section 107(a) and Emhart's exhaustion of all appeals concerning such a judgment.

142. In the Court's August 17, 2017 Phase II Findings of Fact and Conclusions of Law (ECF No. 23:548), the Court found that EPA made several decisions in developing a remedial action that violated CERCLA because they were arbitrary, capricious, or otherwise not in accordance with the law. In addition, the Court stayed the UAO until these matters are resolved and found that Emhart is not required to pay the fines and fees stemming from its non-compliance with the UAO. Finally, the Court retained jurisdiction in this matter to ensure that the issues with EPA's selected remedy are addressed in a manner consistent with the law and not arbitrary or capricious.

143. On July 8, 2018, the United States lodged a proposed consent decree with Emhart and the State of Rhode Island (the "Consent Decree"). (ECF No. 23:671, Ex. 1.) On September 25, 2018, the United States and the State of Rhode Island filed a motion to enter the Consent Decree as a final judgment under Fed. R. Civ. P. 54(b). (ECF No. 23:686.) On April 8, 2019, the Court approved and entered the Consent Decree following full briefing and a hearing on the motion. (ECF No. 23:714, 715.) Under the Consent Decree, Emhart is obligated to remediate the Site and pay all of the United States' and the State of Rhode Island's unrecovered past and future costs, plus interest. As for specific amounts, the Consent Decree, which supersedes the Stipulation, requires Emhart to pay the United States approximately $42 million in past costs, plus interest. The Consent Decree further estimates that Site-related remediation costs could total $96,900,000.

144. On February 28, 2019, Emhart filed its First Amended Third-Party Complaint and Cross-Claim, which included allegations against newly named Cross-Defendants Eli Lilly and Company and Exxon Mobil Corporation. (ECF No. 23:706.)

## DISCOVERY OF UPSTREAM CONTAMINATION SOURCES

### Pre-Remedy Design Sampling and Investigation

145. In May 2019, the contractor performing remediation work at the Site, Loureiro Engineering Associates, Inc. ("LEA"), designed a plan for sampling soil and sediment from areas immediately north of the Site and on the western bank of the Woonasquatucket River across from the Site as part of the Pre-Remedy Design process.

146. The purpose of this sampling was to: (a) obtain data to confirm "background" levels of contamination in areas EPA had presumed to be unaffected by releases of hazardous substances at the Site; and (b) define the northernmost boundary of the Site.

147. Pursuant to plans reviewed and approved by EPA, LEA began Pre-Remedy Design sampling in these areas in July 2019.

148. Laboratory analysis of these samples first became available in September 2019.

149. Rather than confirming background levels, the resulting analysis of this sampling actually indicated that a number of hazardous substances were present in concentrations higher than anticipated based on EPA's earlier background estimates, including numerous hazardous substances being remediated at the Site.

150. Moreover, the location of this contamination could not be explained by scientifically accepted fate and transport mechanisms for contamination associated with historic operations at the Site; rather, the contamination most likely had to have come from an upstream source.

151. Upon learning of the results of this sampling, Emhart began investigating upstream facilities, operations, and related corporate history in order to identify who may be responsible for this contamination.

152. That investigation culminated in the filing of this SAC to assert claims against the Upstream Defendants.

**Ongoing Sampling and Investigative Efforts**

153. Emhart's efforts to characterize the nature and extent of the contamination relating to upstream operations remain ongoing.

154. For example, LEA is actively conducting additional iterative sampling along both sides of the Woonasquatucket River northward.

155. LEA has also submitted a work plan to EPA for approval of another round of proposed sampling depths and locations relating to this contamination.

156. Depending on the results of these efforts, additional sampling could follow.

**NECC CUSTOMER DEFENDANT BACKGROUND**

**Allegations Regarding A. Harrison**

157. During the period of NECC's operations, A. Harrison operated a facility in North Providence, Rhode Island.

158. A. Harrison sent used drums to NECC for recycling, refurbishing, and/or disposal from the North Providence facility.

159. The drums that A. Harrison sent to NECC contained residues of the materials that A. Harrison used, produced, and/or handled at the North Providence facility.

160. The materials that A. Harrison used, produced, and/or handled at the North Providence facility included hazardous substances found at the Site.

161. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, A. Harrison sent drums to NECC containing materials that included hazardous substances found at the Site.

162. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, A. Harrison is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding BASF**
**(The Geigy Companies)**

163. During the period of NECC's operations, the Geigy Companies operated a facility in Cranston, Rhode Island.

164. The Geigy Companies sent used drums to NECC for recycling, refurbishing, and/or disposal from the Cranston facility.

165. The drums that the Geigy Companies sent to NECC contained residues of the materials that the Geigy Companies used, produced, and/or handled at the Cranston facility.

166. The materials that the Geigy Companies used, produced, and/or handled at the Cranston facility included hazardous substances found at the Site.

167. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the Geigy Companies sent drums to NECC containing materials that included hazardous substances found at the Site.

168. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the Geigy Companies are persons who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

169. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, BASF became responsible for certain Site-related liabilities arising from the Geigy Companies' operations.

**Allegations Regarding BASF**
**(Paragon Chemicals)**

170. During the period of NECC's operations, Paragon Chemicals operated a facility on Cook Street in Lincoln, Rhode Island that it shared with certain associated companies.

171. Paragon Chemicals sent used drums to NECC for recycling, refurbishing, and/or disposal from the Lincoln facility.

172. The drums that Paragon Chemicals sent to NECC contained residues of the materials that Paragon Chemicals used, produced, and/or handled at the Lincoln facility.

173. The materials that Paragon Chemicals used, produced, and/or handled at the Lincoln facility included hazardous substances found at the Site.

174. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Paragon Chemicals sent drums to NECC containing materials that included hazardous substances found at the Site.

175. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Paragon Chemicals is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

176. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions and mergers,

BASF became responsible for certain Site-related liabilities arising from Paragon Chemical's operations.

**Allegations Regarding BNS / Hexagon**
**(Brown & Sharpe)**

177. During the period of NECC's operations, Brown & Sharpe operated facilities in North Kingstown, North Providence, and Providence, Rhode Island.

178. Brown & Sharpe sent used drums to NECC for recycling, refurbishing, and/or disposal from the North Kingstown, North Providence, and Providence facilities.

179. The drums that Brown & Sharpe sent to NECC contained residues of the materials that Brown & Sharpe used, produced, and/or handled at the North Kingstown, North Providence, and Providence facilities.

180. The materials that Brown & Sharpe used, produced, and/or handled at the North Kingstown, North Providence, and Providence facilities included hazardous substances found at the Site.

181. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Brown & Sharpe sent drums to NECC containing materials that included hazardous substances found at the Site.

182. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Brown & Sharpe is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

183. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and

name changes, BNS became responsible for certain Site-related liabilities arising from Brown & Sharpe's non-metrology operations

184. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, Hexagon became responsible for certain Site-related liabilities arising from Brown & Sharpe's metrology operations.

**Allegations Regarding CNA Holdings**
**(American Hoechst)**

185. During the period of NECC's operations, American Hoechst operated a facility in Coventry, Rhode Island.

186. American Hoechst sent used drums to NECC for recycling, refurbishing, and/or disposal from the Coventry facility.

187. The drums that American Hoechst sent to NECC contained residues of the materials that American Hoechst used, produced, and/or handled at the Coventry facility.

188. The materials that American Hoechst used, produced, and/or handled at the Coventry facility included hazardous substances found at the Site.

189. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, American Hoechst sent drums to NECC containing materials that included hazardous substances found at the Site.

190. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, American Hoechst is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

191. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, CNA Holdings became responsible for certain Site-related liabilities arising from American Hoechst's operations.

**Allegations Regarding Cranston Print Works**

192. During the period of NECC's operations, Cranston Print Works operated a facility in Cranston, Rhode Island.

193. Cranston Print Works sent used drums to NECC for recycling, refurbishing, and/or disposal from the Cranston facility.

194. The drums that Cranston Print Works sent to NECC contained residues of the materials that Cranston Print Works used, produced, and/or handled at the Cranston facility.

195. The materials that Cranston Print Works used, produced, and/or handled at the Cranston facility included hazardous substances found at the Site.

196. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Cranston Print Works sent drums to NECC containing materials that included hazardous substances found at the Site.

197. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Cranston Print Works is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding Cranston Print Works**
**(Bercen Chemical)**

198. During the period of NECC's operations, Bercen Chemical, independently and later as a division of Cranston Print Works, operated a facility in Providence, Rhode Island.

199. Bercen Chemical sent used drums to NECC for recycling, refurbishing, and/or disposal from the Providence facility.

200. The drums that Bercen Chemical sent to NECC contained residues of the materials that Bercen Chemical used, produced, and/or handled at the Providence facility.

201. The materials that Bercen Chemical used, produced, and/or handled at the Providence facility included hazardous substances found at the Site.

202. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Bercen Chemical sent drums to NECC containing materials that included hazardous substances found at the Site.

203. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Bercen Chemical is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

204. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a transaction that occurred in approximately 1963, Cranston Print Works became responsible for certain Site-related liabilities arising from Bercen Chemical's operations.

**Allegations Regarding Duro Textiles**
**(Duro Finishing)**

205. During the period of NECC's operations, Duro Finishing operated a facility in Fall River, Massachusetts.

206. Duro Finishing sent used drums to NECC for recycling, refurbishing, and/or disposal from the Fall River facility.

207. The drums that Duro Finishing sent to NECC contained residues of the materials that Duro Finishing used, produced, and/or handled at the Fall River facility.

208. The materials that Duro Finishing used, produced, and/or handled at the Fall River facility included hazardous substances found at the Site.

209. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Duro Finishing sent drums to NECC containing materials that included hazardous substances found at the Site.

210. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Duro Finishing is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

211. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions and mergers, Duro Textiles became responsible for certain Site-related liabilities arising from Duro Finishing's operations.

212. Upon information and belief, CSGT, Inc. ("CSGT") also held certain liabilities arising from the operations of Duro Finishing.

213. Based on known evidence and evidence likely to be gathered after further investigation and discovery, CSGT was a Delaware corporation that was dissolved pursuant to the laws of Delaware.

214. To the extent CSGT held liabilities arising from the operations of Duro Finishing, such liabilities are part of the orphan share for the Site.

**Allegations Regarding Eastern Color & Chemical**

215. During the period of NECC's operations, Eastern Color & Chemical operated facilities in Providence and Pawtucket, Rhode Island.

216. Eastern Color & Chemical sent used drums to NECC for recycling, refurbishing, and/or disposal from the Providence and Pawtucket facilities.

217. The drums that Eastern Color & Chemical sent to NECC contained residues of the materials that Eastern Color & Chemical used, produced, and/or handled at the Providence and Pawtucket facilities.

218. The materials that Eastern Color & Chemical used, produced, and/or handled at the Providence and Pawtucket facilities included hazardous substances found at the Site.

219. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Eastern Color & Chemical sent drums to NECC containing materials that included hazardous substances found at the Site.

220. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Eastern Color & Chemical is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding Eastern Resins**
**(Cardinal Chemical)**

221. During the period of NECC's operations, Cardinal Chemical operated a facility in Woonsocket, Rhode Island.

222. Cardinal Chemical sent used drums to NECC for recycling, refurbishing, and/or disposal from the Woonsocket facility.

223. The drums that Cardinal Chemical sent to NECC contained residues of the materials that Cardinal Chemical used, produced, and/or handled at the Woonsocket facility.

224. The materials that Cardinal Chemical used, produced, and/or handled at the Woonsocket facility included hazardous substances found at the Site.

225. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Cardinal Chemical sent drums to NECC containing materials that included hazardous substances found at the Site.

226. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Cardinal Chemical is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

227. In January 1997, Cardinal Chemical changed its name to Eastern Resins.

**Allegations Regarding Exxon**
**(Esso Oil)**

228. During the period of NECC's operations, Esso Oil operated a terminal on Dexter Road in East Providence, Rhode Island, where it handled various bulk chemical and petroleum products and operated a drum-filling line.

229. Esso Oil sent used drums to NECC for recycling, refurbishing, and/or disposal from the East Providence terminal.

230. The drums that Esso Oil sent to NECC contained residues of the materials that Esso Oil used, produced, and/or handled at the East Providence terminal.

231. The materials that Esso Oil used, produced, and/or handled at the East Providence terminal included hazardous substances found at the Site.

232. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Esso Oil sent drums to NECC containing materials that included hazardous substances found at the Site.

233. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Esso Oil is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

234. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, Exxon became responsible for certain Site-related liabilities arising from Esso Oil's operations.

**Allegations Regarding Henkel**
**(Tanner)**

235. During the period of NECC's operations, Tanner operated facilities in Providence, Rhode Island; Warwick, Rhode Island; and Greenville, South Carolina.

236. Tanner sent used drums to NECC for recycling, refurbishing, and/or disposal from its Providence, Warwick, and Greenville facilities.

237. The drums that Tanner sent to NECC contained residues of the materials that Tanner used, produced, and/or handled at its Providence, Warwick, and Greenville facilities.

238. The materials that Tanner used, produced, and/or handled at its Providence, Warwick, and Greenville facilities included hazardous substances found at the Site.

239. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Tanner sent drums to NECC containing materials that included hazardous substances found at the Site.

240. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Tanner is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

241. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions and mergers, Henkel became responsible for certain Site-related liabilities arising from Tanner's operations.

**Allegations Regarding Indusol**
**(Industrial Solvents & Chemicals)**

242. During the period of NECC's operations, Industrial Solvents & Chemicals operated a facility in Sutton, Massachusetts.

243. Industrial Solvents & Chemicals sent used drums to NECC for recycling, refurbishing, and/or disposal from the Sutton facility.

244. The drums that Industrial Solvents & Chemicals sent to NECC contained residues of the materials that Industrial Solvents & Chemicals used, produced, and/or handled at the Sutton facility.

245. The materials that Industrial Solvents & Chemicals used, produced, and/or handled at the Sutton facility included hazardous substances found at the Site.

246. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Industrial Solvents & Chemicals sent drums to NECC containing materials that included hazardous substances found at the Site.

247. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Industrial Solvents & Chemicals is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

248. In October 1981, Industrial Solvents & Chemicals changed its name to Indusol.

**Allegations Regarding IVAX**
**(U.S. Oil)**

249. During the period of NECC's operations, U.S. Oil operated a facility on Dexter Road in East Providence, Rhode Island.

250. U.S. Oil sent used drums to NECC for recycling, refurbishing, and/or disposal from the East Providence facility.

251. The drums that U.S. Oil sent to NECC contained residues of the materials that U.S. Oil used, produced, and/or handled at the East Providence facility.

252. The materials that U.S. Oil used, produced, and/or handled at the East Providence facility included hazardous substances found at the Site.

253. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, U.S. Oil sent drums to NECC containing materials that included hazardous substances found at the Site.

254. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, U.S. Oil is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

255. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, IVAX became responsible for certain Site-related liabilities arising from U.S. Oil's operations.

**Allegations Regarding Olin**
**(Wayland Chemical)**

256. During the period of NECC's operations, Wayland Chemical operated a facility in Lincoln, Rhode Island.

257. Wayland Chemical sent used drums to NECC for recycling, refurbishing, and/or disposal from the Lincoln facility.

258. The drums that Wayland Chemical sent to NECC contained residues of the materials that Wayland Chemical used, produced, and/or handled at the Lincoln facility.

259. The materials that Wayland Chemical used, produced, and/or handled at the Lincoln facility included hazardous substances found at the Site.

260. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Wayland Chemical sent drums to NECC containing materials that included hazardous substances found at the Site.

261. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Wayland Chemical is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of

hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

262. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, Olin became responsible for certain Site-related liabilities arising from Wayland Chemical's operations.

**Allegations Regarding Organic Dyestuffs**
**(Organic Chemical)**

263. During the period of NECC's operations, Organic Chemical operated facilities in Providence and East Providence, Rhode Island.

264. Organic Chemical sent used drums to NECC for recycling, refurbishing, and/or disposal from the Providence and East Providence facilities.

265. The drums that Organic Chemical sent to NECC contained residues of the materials that Organic Chemical used, produced, and/or handled at the Providence and East Providence facilities.

266. The materials that Organic Chemical used, produced, and/or handled at the Providence and East Providence facilities included hazardous substances found at the Site.

267. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Organic Chemical sent drums to NECC containing materials that included hazardous substances found at the Site.

268. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Organic Chemical is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of

hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

269. In March 1985, Organic Chemical changed its name to Organic Dyestuffs.

**Allegations Regarding Phibro**
**(Philipp Brothers Chemicals)**

270. During the period of NECC's operations, Philipp Brothers Chemicals operated a facility in Holbrook, Massachusetts.

271. Philipp Brothers Chemicals sent used drums to NECC for recycling, refurbishing, and/or disposal from the Holbrook facility.

272. The drums that Philipp Brothers Chemicals sent to NECC contained residues of the materials that Philipp Brothers Chemicals used, produced, and/or handled at the Holbrook facility.

273. The materials that Philipp Brothers Chemicals used, produced, and/or handled at the Holbrook facility included hazardous substances found at the Site.

274. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Philipp Brothers Chemicals sent drums to NECC containing materials that included hazardous substances found at the Site.

275. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Philipp Brothers Chemicals is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

276. In July 2003, Philipp Brothers Chemicals changed its name to Phibro.

**Allegations Regarding Sequa**
**(The Warwick Companies)**

277. During the period of NECC's operations the Warwick Companies operated a facility in Wood River Junction, Rhode Island.

278. The Warwick Companies sent used drums to NECC for recycling, refurbishing, and/or disposal from the Wood River Junction facility.

279. The drums that the Warwick Companies sent to NECC contained residues of the materials that the Warwick Companies used, produced, and/or handled at the Wood River Junction facility.

280. The materials that the Warwick Companies used, produced, and/or handled at the Wood River Junction facility included hazardous substances found at the Site.

281. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the Warwick Companies sent drums to NECC containing materials that included hazardous substances found at the Site.

282. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the Warwick Companies are persons who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

283. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions and name changes, Sequa became responsible for certain Site-related liabilities arising from the Warwick Companies' operations.

**Allegations Regarding Teknor Apex Co.**
**(The Teknor Companies)**

284. During the period of NECC's operations, the Teknor Companies operated facilities in Pawtucket, Rhode Island and Attleboro, Massachusetts.

285. The Teknor Companies sent used drums to NECC for recycling, refurbishing, and/or disposal from the Pawtucket and Attleboro facilities.

286. The drums that the Teknor Companies sent to NECC contained residues of the materials that the Teknor Companies used, produced, and/or handled at the Pawtucket and Attleboro facilities.

287. The materials that the Teknor Companies used, produced, and/or handled at the Pawtucket and Attleboro facilities included hazardous substances found at the Site.

288. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the Teknor Companies sent drums to NECC containing materials that included hazardous substances found at the Site.

289. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the Teknor Companies are persons who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding New Original Bradford**
**(Original Bradford)**

290. During the period of NECC's operations, Original Bradford operated a facility in West Warwick, Rhode Island.

291. Original Bradford sent used drums to NECC for recycling, refurbishing, and/or disposal from the West Warwick facility.

292. The drums that Original Bradford sent to NECC contained residues of the materials that Original Bradford used, produced, and/or handled at the West Warwick facility.

293. The materials that Original Bradford used, produced, and/or handled at the West Warwick facility included hazardous substances found at the Site.

294. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Original Bradford sent drums to NECC containing materials that included hazardous substances found at the Site.

295. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Original Bradford is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

296. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions and name changes, New Original Bradford became responsible for certain Site-related liabilities arising from Original Bradford's operations.

**Allegations Regarding Union Oil**
**(The AMSCO Companies)**

297. During the period of NECC's operations, the AMSCO Companies operated facilities in Providence and East Providence, Rhode Island.

298. The AMSCO Companies sent used drums to NECC for recycling, refurbishing, and/or disposal from the Providence and East Providence facilities.

299. The drums that the AMSCO Companies sent to NECC contained residues of the materials that the AMSCO Companies used, produced, and/or handled at the Providence and East Providence facilities.

300. The materials that the AMSCO Companies used, produced, and/or handled at the Providence and East Providence facilities included hazardous substances found at the Site.

301. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the AMSCO Companies sent drums to NECC containing materials that included hazardous substances found at the Site.

302. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the AMSCO Companies are persons who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

303. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions and mergers, Union Oil became responsible for certain Site-related liabilities arising from the AMSCO Companies' operations.

**Allegations Regarding Worcester Company**

304. During the period of NECC's operations, Worcester Company operated a facility in North Providence, Rhode Island.

305. Worcester Company sent used drums to NECC for recycling, refurbishing, and/or disposal from its North Providence facility.

306. The drums that Worcester Company sent to NECC contained residues of the materials that Worcester Company used, produced, and/or handled at its North Providence facility.

307. The materials that Worcester Company used, produced, and/or handled at its North Providence facility included hazardous substances found at the Site.

308. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Worcester Company sent drums to NECC containing materials that included hazardous substances found at the Site.

309. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Worcester Company is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding NECC Arranger Orphan Shares**

310. During the period of NECC's operations, a number of additional entities that operated in the New England region sent used drums to NECC for recycling, refurbishing, and/or disposal (the "NECC Arranger Orphans").

311. The used drums that the NECC Arranger Orphans sent to NECC contained residues of the materials that the NECC Arranger Orphans used, produced, and/or handled in their operations.

312. The materials that the NECC Arranger Orphans used, produced, and/or handled included hazardous substances found at the Site.

313. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the NECC Arranger Orphans sent drums to NECC containing materials that included hazardous substances found at the Site.

314. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, each of the NECC Arranger Orphans is a person

who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

315. Because the NECC Arranger Orphans no longer exist, and no successor has yet been identified, their share of liability is considered to be an "orphan share."

316. Defendants are responsible for the orphan share arising from the operations of the NECC Arranger Orphans.

**Allegations Regarding NECC Transporter Orphan Shares**

317. During the period of NECC's operations, a number of additional entities that operated in the New England region transported used drums from various companies to NECC for recycling, refurbishing, and/or disposal (the "NECC Transporter Orphans").

318. The used drums that the NECC Transporter Orphans transported to NECC contained residues of the materials that customers of the NECC Transporter Orphans used, produced, and/or handled in their operations.

319. The materials that the customers of the NECC Transporter Orphans used, produced, and/or handled included hazardous substances found at the Site.

320. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the NECC Transporter Orphans transported drums to NECC containing materials that included hazardous substances found at the Site.

321. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, each of the NECC Transporter Orphans is a person who "accepted . . . hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened

release which causes the incurrence of response costs, of a hazardous substance," within the meaning of CERCLA section 107(a)(4), 42 U.S.C. § 9607(a)(4).

322. Because the NECC Transporter Orphans no longer exist, and no successor has yet been identified, their share of liability is considered to be an "orphan share."

323. Defendants are responsible for the orphan share arising from the operations of the NECC Transporter Orphans.

**Allegations Regarding NECC Orphan Share**

324. NECC is or was a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

325. NECC operated at the Site at a time when hazardous substances were disposed of or released at the Site, and its operation of its drum reconditioning facility and related waste disposal practices resulted in the release or threatened release of hazardous substances at the Site, including dioxins, PCBs, PAHs, VOCs, SVOCs, metals, and pesticides.

326. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, NECC is a "covered person" under CERCLA section 107(a)(1), (2), and (4), 42 U.S.C. § 9607(a)(1), (2), (4).

327. NECC entered into a consent decree with the United States on April 10, 2015, pursuant to which NECC paid the United States a sum of $8,750,000.00.

328. To the extent NECC's share of liability for the remediation of the Site exceeds the sum of $8,750,000.00, that amount is considered to be an "orphan share."

329. Defendants are responsible for the orphan share arising from the operations of NECC (the "NECC Operations Orphan").

## UPSTREAM DEFENDANT BACKGROUND

### Allegations Regarding BNS / Hexagon (Brown & Sharpe)

330. From 1950 until 1983, Brown & Sharpe operated a facility in North Providence, Rhode Island.

331. Upon information and belief, Brown & Sharpe owned this facility during some or all of this time period.

332. Upon information and belief, Brown & Sharpe's North Providence facility was adjacent to facilities operated by other entities, including, without limitation, the Greystone Companies, Induplate, Induplate Operations, and Worcester Company (the "B&S-Adjacent Facilities").

333. Upon information and belief, at various points in time, Brown & Sharpe may have owned certain of the B&S-Adjacent Facilities, including, without limitation, the facility at which Worcester Company operated.

334. During the time period of its operations at its North Providence facility, Brown & Sharpe released materials into the Woonasquatucket River from the facility.

335. During the time period of Brown & Sharpe's ownership of its North Providence facility and the B&S-Adjacent Facilities, materials were released into the Woonasquatucket River from the facilities.

336. The materials released into the Woonasquatucket River from Brown & Sharpe's North Providence facility and the B&S-Adjacent Facilities were materials used, produced, and/or handled at the facilities.

337. The materials used, produced, and/or handled at Brown & Sharpe's North Providence facility and the B&S-Adjacent Facilities included hazardous substances found at the Site.

338. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the materials released into the Woonasquatucket River from Brown & Sharpe's North Providence facility and the B&S-Adjacent Facilities included hazardous substances found at the Site.

339. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, these materials ultimately came to be located at the Site.

340. Accordingly, upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Brown & Sharpe is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

341. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, BNS became responsible for certain Site-related liabilities arising from Brown & Sharpe's non-metrology operations.

342. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and name changes, Hexagon became responsible for certain Site-related liabilities arising from Brown & Sharpe's metrology operations.

### Allegations Regarding Evans Plating

343. From 1968 until 2005, Evans Plating operated a facility in Johnston, Rhode Island.

344. Between 1952 and the present, Evans Plating has operated a facility in North Providence, Rhode Island.

345. Upon information and belief, Evans Plating has owned these facilities during some or all of these time periods.

346. During the time period of its operations at its Johnston and North Providence facilities, Evans Plating released materials into the Woonasquatucket River from the facilities.

347. During the time period of Evans Plating's ownership of its Johnston and North Providence facilities, materials were released into the Woonasquatucket River from the facilities.

348. The materials released into the Woonasquatucket River from Evans Plating's Johnston and North Providence facilities were materials used, produced, and/or handled at the facilities.

349. The materials used, produced, and/or handled at Evans Plating's Johnston and North Providence facilities included hazardous substances found at the Site.

350. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the materials released into the Woonasquatucket River from Evans Plating's Johnston and North Providence facilities included hazardous substances found at the Site.

351. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, these materials ultimately came to be located at the Site.

352. Accordingly, upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Evans Plating is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding Greystone**
**(The Greystone Companies / Brown & Sharpe)**

353. From 1932 to 1974, the Greystone Companies operated a facility in Johnston, Rhode Island.

354. Between 1974 and the present, the Greystone Companies have operated a facility in North Providence, Rhode Island.

355. Upon information and belief, the Greystone Companies have owned these facilities during some or all of these time periods.

356. Upon information and belief, the Greystone Companies' North Providence facilities were adjacent to facilities operated by other entities, including, without limitation, Brown & Sharpe, Induplate, Induplate Operations, and Worcester Company (the "Greystone-Adjacent Facilities").

357. Upon information and belief, at various points in time, certain of the Greystone Companies may have owned certain of the Greystone-Adjacent Facilities, including, without limitation, the facility at which Brown & Sharpe operated.

358. During the time period of their operations at their Johnston and North Providence facilities, the Greystone Companies released materials into the Woonasquatucket River from the facilities.

359. During the time period of the Greystone Companies' ownership of their Johnston and North Providence facilities and the Greystone-Adjacent Facilities, materials were released into the Woonasquatucket River from the facilities.

360. The materials released into the Woonasquatucket River from the Greystone Companies' Johnston and North Providence facilities and the Greystone-Adjacent Facilities were materials used, produced, and/or handled at the facilities.

361. The materials used, produced, and/or handled at the Greystone Companies' Johnston and North Providence facilities and the Greystone-Adjacent Facilities included hazardous substances found at the Site.

362. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the materials released into the Woonasquatucket River from the Greystone Companies' Johnston and North Providence facilities and the Greystone-Adjacent Facilities included hazardous substances found at the Site.

363. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, these materials ultimately came to be located at the Site.

364. Accordingly, upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the Greystone Companies are persons who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

365. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, through a series of transactions, mergers, and

name changes, Greystone became responsible for certain Site-related liabilities arising from the operations of the Greystone Companies.

**Allegations Regarding Induplate**

366. From 1989 until at least 2001, Induplate operated a facility in North Providence, Rhode Island.

367. Upon information and belief, Induplate owned this facility during some or all of this time period.

368. Upon information and belief, Induplate's North Providence facility was adjacent to facilities operated by other entities, including, without limitation, the Greystone Companies, Induplate Operations, and Worcester Company (the "Induplate-Adjacent Facilities").

369. Upon information and belief, at various points in time, Induplate may have owned certain of the Induplate-Adjacent Facilities.

370. During the time period of its operations at its North Providence facility, Induplate released materials into the Woonasquatucket River from the facility.

371. During the time period of Induplate's ownership of its North Providence facility and the Induplate-Adjacent Facilities, materials were released into the Woonasquatucket River from the facilities.

372. The materials released into the Woonasquatucket River from Induplate's North Providence facility and the Induplate-Adjacent Facilities were materials used, produced, and/or handled at the facilities.

373. The materials used, produced, and/or handled at Induplate's North Providence facility and the Induplate-Adjacent Facilities included hazardous substances found at the Site.

374. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the materials released into the Woonasquatucket River from Induplate's North Providence facility and the Induplate-Adjacent Facilities included hazardous substances found at the Site.

375. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, these materials ultimately came to be located at the Site.

376. Accordingly, upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Induplate is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding Induplate Operations**

377. From 2001 through the present, Induplate Operations has operated a facility in North Providence, Rhode Island.

378. Upon information and belief, Induplate Operations has owned this facility during some or all of this time period.

379. Upon information and belief, Induplate Operations' North Providence facility was adjacent to facilities operated by other entities, including, without limitation, the Greystone Companies, Induplate, and Worcester Company (the "Induplate Operations-Adjacent Facilities").

380. Upon information and belief, at various points in time, Induplate Operations may have owned certain of the Induplate-Adjacent Facilities.

381. During the time period of its operations at its North Providence facility, Induplate Operations released materials into the Woonasquatucket River from the facility.

382. During the time period of Induplate Operations' ownership of its North Providence facility and the Induplate Operations-Adjacent Facilities, materials were released into the Woonasquatucket River from the facilities.

383. The materials released into the Woonasquatucket River from Induplate Operations' North Providence facility and the Induplate Operations-Adjacent Facilities were materials used, produced, and/or handled at the facilities.

384. The materials used, produced, and/or handled at Induplate Operations' North Providence facility and the Induplate Operations-Adjacent Facilities included hazardous substances found at the Site.

385. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the materials released into the Woonasquatucket River from Induplate Operations' North Providence facility and the Induplate Operations-Adjacent Facilities included hazardous substances found at the Site.

386. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, these materials ultimately came to be located at the Site.

387. Accordingly, upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Induplate Operations is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding Worcester Company**

388. From approximately 1940 until at least 1999, Worcester Company operated a facility in North Providence, Rhode Island.

389. Upon information and belief, Worcester Company owned this facility during some or all of this time period.

390. Upon information and belief, Worcester Company's North Providence facility was adjacent to facilities operated by other entities, including, without limitation, Brown & Sharpe, the Greystone Companies, Induplate, and Induplate Operations (the "Worcester-Adjacent Facilities").

391. Upon information and belief, at various points in time, Worcester Company may have owned certain of the Worcester-Adjacent Facilities.

392. During the time period of its operations at its North Providence facility, Worcester Company released materials into the Woonasquatucket River from the facility.

393. During the time period of Worcester Company's ownership of its North Providence facility and the Worcester-Adjacent Facilities, materials were released into the Woonasquatucket River from the facilities.

394. The materials released into the Woonasquatucket River from Worcester Company's North Providence facility and the Worcester-Adjacent Facilities were materials used, produced, and/or handled at the facilities.

395. The materials used, produced, and/or handled at Worcester Company's North Providence facility and the Worcester-Adjacent Facilities included hazardous substances found at the Site.

396. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the materials released into the Woonasquatucket River from Worcester Company's North Providence facility and the Worcester-Adjacent Facilities included hazardous substances found at the Site.

397. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, these materials ultimately came to be located at the Site.

398. Accordingly, upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Worcester Company is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**Allegations Regarding Upstream Orphan Shares**

399. Various entities that are no longer viable have also historically conducted operations along the Woonasquatucket River upstream of the Site (the "Upstream Orphans").

400. Upon information and belief, the Upstream Orphans owned the facilities at which these operations were conducted during some or all of the time period of these operations.

401. During the time period of their operations at their respective upstream facilities, the Upstream Orphans released materials into the Woonasquatucket River from the facilities.

402. During the time period of the Upstream Orphans' ownership of their respective upstream facilities, materials were released into the Woonasquatucket River from the facilities.

403. The materials released into the Woonasquatucket River from the Upstream Orphans' upstream facilities were materials used, produced, and/or handled at the facilities.

404. The materials used, produced, and/or handled at the Upstream Orphans' upstream facilities included hazardous substances found at the Site.

405. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, the materials released into the Woonasquatucket

River from the Upstream Orphans' upstream facilities included hazardous substances found at the Site.

406. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, these materials ultimately came to be located at the Site.

407. Accordingly, upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, each of the Upstream Orphans is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

408. Because the Upstream Orphans no longer exist, and no successor has yet been identified, their share of liability is considered to be an "orphan share."

409. Defendants are responsible for the orphan share arising from the operations of the Upstream Orphans.

## ELI LILLY BACKGROUND

### Allegations Regarding Eli Lilly

410. Eli Lilly manufactured pesticides from 1960 to 1997.

411. For some period of time including at least a portion of 1963, Metro-Atlantic manufactured the chemical Treflan for Eli Lilly at Metro-Atlantic's facility on the Site.

412. Eli Lilly provided Metro-Atlantic with certain raw materials, solvents, and emulsifiers.

413. Eli Lilly did not disclose to Metro-Atlantic the composition of all the materials it provided to Metro-Atlantic.

414. Metro-Atlantic blended the materials that Eli Lilly provided to it according to Eli Lilly's specifications.

415. Eli Lilly told Metro-Atlantic where to send the finished products.

416. Throughout the manufacturing process, Eli Lilly retained ownership of the raw materials and the final product.

417. On several occasions, an Eli Lilly representative visited the Metro-Atlantic facility to oversee the manufacturing process.

418. The Treflan manufacturing process included the materials parachlorobenzotrifluoride, 3.5-dinitro-4-chlorobenzotrifluoride, dipropylamine, and solvents and emulsifiers.

419. The materials used, produced, and/or handled in the Treflan manufacturing process included hazardous substances similar to those found at the Site.

420. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Metro-Atlantic's manufacturing of Treflan for Eli Lilly resulted in releases and threats of releases of hazardous substances onto soils or into waterways the Site.

421. Upon information and belief, based on known evidence and evidence likely to be gathered after further investigation and discovery, Eli Lilly is a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

<u>**DAMAGES**</u>

422. As noted above, Emhart has incurred past costs, is incurring ongoing costs, and will incur future costs relating to the environmental harm at the Site.

423. The precise amount of many of these damages is not yet determinable.

424. For example, although the Consent Decree estimates the total possible cost of the remediation, the remediation's actual cost will not be known until work is completed at the Site.

425. Likewise, Emhart's future costs will likely include Natural Resource Damages, which have yet to be determined.

<u>**CERCLA PRIMA FACIE ELEMENTS**</u>

**NECC Customer Defendants and Related Orphans**

426. The Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

427. The NECC Customer Defendants and the NECC Arranger and Transporter Orphans sent and/or transported materials to NECC for disposal at the Site that are "hazardous substances" within the meaning of CERCLA section 101(14), 42 U.S.C. § 9601(14).

428. NECC's disposal of the hazardous substances it received from the NECC Customer Defendants and NECC Arranger and Transporter Orphans onto the Site amounted to a "release" within the meaning of CERCLA section 101(22), 42 U.S.C. § 9601(22).

429. Emhart has incurred, and will continue to incur, reasonable and necessary "response costs" within the meaning of CERCLA section 101(25), 42 U.S.C. § 9601(25), as a result of the on-Site releases of the hazardous substances that the NECC Customer Defendants and NECC Arranger and Transporter Orphans sent to NECC.

430. The costs incurred and to be incurred by Emhart were and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

431. Each of the NECC Customer Defendants, NECC Arranger Orphans, NECC Transporter Orphans, and any predecessors thereto, is liable under CERCLA section 107(a), 42 U.S.C. § 9607(a), as an arranger, transporter, or otherwise.

**Upstream Defendants and Related Orphans**

432. The Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

433. The facilities at which the Upstream Defendants and Upstream Orphans operated along the Woonasquatucket River upstream of the Site are "facilities" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

434. The Upstream Defendants and Upstream Orphans "owned" and/or "operated" these facilities within the meaning of CERCLA section 101(20), 42 U.S.C. § 9601(20), at the time hazardous substances were "released" at the facilities within the meaning of CERCLA section 101(22), 42 U.S.C. § 9601(22).

435. These hazardous substances eventually came to be located at the Site.

436. Accordingly, the Upstream Defendants and Upstream Orphans are also persons who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

437. Emhart has incurred, and will continue to incur, reasonable and necessary "response costs" within the meaning of CERCLA section 101(25), 42 U.S.C. § 9601(25), as a result of these releases of hazardous substances.

438. The costs incurred and to be incurred by Emhart were and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

439. The Upstream Defendants and Upstream Orphans are liable under CERCLA section 107(a), 42 U.S.C. § 9607(a), as owners, operators, arrangers, transporters, or otherwise.

**Eli Lilly**

440. The Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

441. The building in which Treflan was manufactured at the Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

442. Eli Lilly "operated" these facilities within the meaning of CERCLA section 101(20), 42 U.S.C. § 9601(20), at the time hazardous substances were "released" at the facilities within the meaning of CERCLA section 101(22), 42 U.S.C. § 9601(22).

443. As a result of these releases and given that Eli Lilly directed, controlled, specified, and participated in the Treflan operation, Eli Lilly is also a person who "arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances" at the Site, within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

444. Emhart has incurred, and will continue to incur, reasonable and necessary "response costs" within the meaning of CERCLA section 101(25), 42 U.S.C. § 9601(25), as a result of these releases of hazardous substances.

445. The costs incurred and to be incurred by Emhart were and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

446. Eli Lilly is liable under CERCLA section 107(a), 42 U.S.C. § 9607(a), as an operator, arranger, transporter, or otherwise.

## FIRST CLAIM FOR RELIEF

**CERCLA Contribution**

447. Emhart incorporates by reference, as if fully set forth herein, Paragraphs 1 through 446 of this SAC.

448. The Court has issued an opinion finding Emhart jointly and severally liable under CERCLA section 107(a), 42 U.S.C. § 9607(a), in connection with the Site.

449. Pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), (f)(3)(B), Emhart is entitled to contribution from each Defendant of a fair and equitable share of the response costs that Emhart has incurred or will incur in connection with response actions regarding the Site, including amounts attributable to the NECC Arranger Orphans, NECC Transporter Orphans, NECC Operations Orphan, and Upstream Orphans (collectively, the "Orphans") and applicable interest as provided for in 42 U.S.C. § 9607(a).

## SECOND CLAIM FOR RELIEF

**CERCLA Cost Recovery**

450. Emhart incorporates by reference, as if fully set forth herein, Paragraphs 1 through 449 of this SAC.

451. Each Defendant is jointly and severally liable for the necessary response costs that Emhart has incurred in connection with the Site, including any amounts attributable to any Orphans and applicable interest as provided for in CERCLA section 107(a), 42 U.S.C. § 9607(a), to the extent Emhart is entitled to recover such costs under that subsection.

## THIRD CLAIM FOR RELIEF

**CERCLA Declaratory Judgment**

452. Emhart incorporates by reference, as if fully set forth herein, Paragraphs 1 through 451 of this SAC.

453. A present, actual, and justiciable controversy exists between Emhart and Defendants concerning the nature and extent of Defendants' obligation to pay for anticipated future response costs or damages in connection with the Site.

454. In connection with Emhart's claims for both cost recovery and contribution, CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2), permits the Court to "enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

455. Pursuant to CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2), and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., Emhart is entitled to a judgment declaring that Defendants are liable for future response costs or damages to be incurred in connection with the Site, including amounts attributable to any Orphans and applicable interest as provided for in CERCLA section 107(a), 42 U.S.C. § 9607(a)

456. Pursuant to CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2), and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., Emhart is entitled to a judgment declaring each Defendant's respective share of liability for future response costs or damages to be incurred in connection with the Site, including amounts attributable to any Orphans and applicable interest as provided for in CERCLA section 107(a), 42 U.S.C. § 9607(a).

## PRAYER

WHEREFORE, Emhart prays that this Court grant the following relief:

1. Judgment against all Defendants in an amount equal to their respective equitable shares of response costs incurred and to be incurred by Emhart in connection with the Site, including any such costs attributable to any Orphans and applicable interest as provided by law.

2. Judgment against all Defendants jointly and severally for response costs incurred by Emhart in connection with the Site that are recoverable under CERCLA section 107(a), including any such costs attributable to any Orphans and applicable interest as provided by law.

3. Judgment against all Defendants declaring that each is liable for future response costs or damages to be incurred in connection with the Site, including any such costs attributable to any Orphans and applicable interest as provided by law.

4. Judgment against all Defendants declaring their respective shares of liability for future response costs or damages to be incurred in connection with the Site.

5. Attorneys' fees and costs, as provided by law.

6. Pre-judgment and post-judgment interest, as provided by law.

7. Any such other relief as the Court may deem just and appropriate under the circumstances.

Respectfully submitted,

Dated: July 24, 2020

*/s/ Rachelle R. Green*

Rachelle R. Green (#5870)
Cervenka Green & Ducharme LLC
235 Promenade Street, Suite 475
Providence, RI 02908
401.214.1020
rgreen@cgdesq.com

Joseph W. Hovermill (*Pro Hac Vice*)
Joseph L. Beavers (*Pro Hac Vice*)
Alexander P. Creticos (*Pro Hac Vice*)
Van P. Hilderbrand, Jr. (*Pro Hac Vice*)
Jeffrey S. Wettengel (*Pro Hac Vice*)
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD 21202
410.385.3582
jbeavers@milesstockbridge.com